(No. 50360.—

THE BOARD OF TRUSTEES OF COMMUNITY COL-
LEGE DISTRICT NO. 508, COUNTY OF COOK,
Appellant, v. COOK COUNTY COLLEGE TEACH-
ERS UNION, LOCAL 1600, AFT, AFL/CIO *et al.*,
Appellees.

*Opinion filed January 26, 1979.*

Lawrence T. Stanner, of Chicago, for appellant.

Gilbert Feldman, of Cornfield and Feldman, of Chicago, for appellee.

MR. JUSTICE MORAN delivered the opinion of the court:

This action, brought by the board of trustees of Community College District No. 508 (plaintiff) in the circuit court of Cook County, sought to declare void and unenforceable an arbitration award which was rendered pursuant to a collective bargaining agreement with the Cook County College Teachers Union, Local 1600, AFT, AFL/CIO (defendant). The effect of the arbitrator's award, plaintiff alleged, was to give priority in the assignment of extra work to those faculty members who had participated in an illegal strike. The trial court issued a declaratory judgment and injunction in favor of plaintiff and ruled that the arbitrator's award was null and void because it required plaintiff to perform "an act illegal and contrary to public policy." The appellate court, in a majority decision, reversed. (55 Ill. App. 3d 435.) It held that the issue of extra-work assignments was arbitrable and that the arbitrator's determination was, therefore, binding upon the parties to the collective bargaining agreement. We granted plaintiff leave to appeal.

Plaintiff operates the city colleges of Chicago, a system of seven junior colleges within the city of Chicago. Since 1967, defendant has been the bargaining representative of the full-time faculty members employed by plaintiff. During the summer and fall of 1975, the parties were engaged in collective bargaining negotiations over what ultimately became a two-year collective bargaining agreement, which agreement remained in effect until June 30, 1977. The fall semester of the 1975-76 school year was to have begun on August 19, 1975, but because the parties could not reach an agreement by that date, a strike ensued. Approximately 90% of plaintiff's faculty refused to cross the picket line. The remaining 10% of the teaching personnel crossed the picket line and reported to work each day of the strike. On August 25, 1975, the circuit

court of Cook County ordered that the strike be terminated on the grounds that such strikes by public employees were illegal and contrary to public policy. In contravention of the court's injunction, 90% of the faculty continued to participate in the illegal strike. The strike endured for a total of three weeks.

Because of the strike, plaintiff extended the fall semester two weeks beyond the original termination date. The teachers who participated in the strike received no pay for the three-week strike period during which they did not work. The nonstriking teachers were paid their regular salaries for working the duration of the strike. Both the striking and nonstriking teachers received prorated salaries for the two-week period which extended beyond the originally scheduled semester. Consequently, the striking teachers received one week of pay less than their expected base salaries for the fall semester, and the nonstriking teachers received two weeks of pay in excess of their base salaries for the same period. This income disparity is at the source of the controversy between the parties.

In January 1976, shortly after the extended fall semester terminated, a dispute erupted between the parties as to the assignment of extra work to the faculty for the 1976 summer session. The parties, having recognized that such assignments entitled qualified faculty members to additional pay, incorporated into their collective bargaining agreement a rotational point system by which such assignments could be made in a manner that would equalize the extra-work opportunities for all qualified teachers. Rotation points were to be computed according to the following formula:

> "[O]ne rotation point for each 12½% of extra pay above a faculty member's base rate of pay."

The term "base rate of pay" was not defined in the agreement. The collective bargaining agreement also provided:

"The number of points based on the amount of extra work assigned in the past will determine the eligibility of the faculty member for extra work, with those who have the fewest number of points having priority."

Pursuant to the collective bargaining agreement, plaintiff, in January 1976, prepared a salary list which was to be used in the computation of rotation points and which, in turn, would be used in the assignment of extra work for the 1976 summer session. The salary list was to include "all pay earned by each faculty member" through the end of the preceding semester. The dispute ensued when plaintiff failed to include the pay earned by the nonstriking teachers during the three-week strike period. On January 21, 1976, defendant presented its grievance to plaintiff as provided for in the collective bargaining agreement. When plaintiff denied the grievance, defendant submitted the case to arbitration. The collective bargaining agreement provided that defendant was entitled to submit any unresolved grievance, which involved the application or interpretation of the agreement, to the single arbitrator appointed mutually by the parties.

Defendant argued before the arbitrator that the collective bargaining agreement expressly provided that the salary lists were to include all pay earned during the fall semester and that there was no basis upon which to exclude the pay earned during the three-week strike period. By defendant's interpretation, the nonstriking teachers, in effect, would have earned two weeks of "extra pay" above their expected base pay for the semester, and, consequently, would be in an inferior position *vis-a-vis* striking teachers with regard to the assignment of extra work. Plaintiff maintained that the income earned by the nonstrikers during the strike period derived from their regular work assignments, not from extra work, which, it argued, was the only basis upon which eligibility for future extra work was to be determined. Plaintiff also contended

that defendant's construction, which would result in treatment preferential to illegal strikers, was contrary to law and therefore unenforceable. Following a hearing, expedited at the request of plaintiff, the arbitrator ruled in favor of defendant. In interpreting the provisions of the collective bargaining agreement, the arbitrator found that its terms clearly provided that rotation points be based on all income earned by faculty members in excess of their expected base pay, and that the terms admitted of no qualifications or exceptions for earnings during strike periods. The arbitrator also concluded that the construction adopted did not violate any law.

Because plaintiff has advocated numerous grounds for vacating the arbitrator's decision and because we find only one of them persuasive, it is appropriate that we clarify at the outset the very limited scope of review reserved by courts when asked to vacate arbitration awards.

This court has long recognized the overriding interest in finality which inheres in the submission of disputes to arbitration, and, accordingly, has counseled against judicial review of the merits of arbitration awards. (*White Star Mining Co. v. Hultberg* (1906), 220 Ill. 578; *Stone v. Baldwin* (1907), 226 Ill. 338.) That this general standard, applicable to both labor and nonlabor arbitration, has been even more narrowly circumscribed in reviewing collective bargaining agreements is evident in the series of seminal Supreme Court decisions often referred to as the Steelworkers Trilogy. Therein, the court stated:

"In our role of developing a meaningful body of law to govern the interpretation and enforcement of collective bargaining agreements, we think special heed should be given to the context in which collective bargaining agreements are negotiated and the purpose which they are intended to serve. [Citation.] The function of the court is very limited when the parties have agreed to

submit all questions of contract interpretation to the arbitrator." (*United Steelworkers of America v. American Manufacturing Co.* (1960), 363 U.S. 564, 567-68, 4 L. Ed. 2d 1403, 1406-07, 80 S. Ct. 1343, 1346.)

The court declared that the arbitration of collective bargaining disputes was *sui generis* in that such arbitration was not only a substitute for litigation, but a necessary complement to negotiation and an expedient in averting economic strife between the parties. (*United Steelworkers of America v. Warrior & Gulf Navigation Co.* (1960), 363 U.S. 574, 578, 4 L. Ed. 2d 1409, 1415, 80 S. Ct. 1347, 1351.) One year after the Steelworkers Trilogy cases, the Illinois legislature, in adopting the Uniform Arbitration Act (Ill. Rev. Stat. 1961, ch. 10, par. 101 *et seq.*), endorsed the policy of treating arbitration in collective bargaining cases as a unique agency. The Act specifies the grounds for vacating, modifying or correcting arbitration awards, but expressly exempts awards entered pursuant to collective bargaining arbitration. Ill. Rev. Stat. 1975, ch. 10, par. 112(e). Also see Ill. Ann. Stat., ch. 10, Introductory Note, at 401-02 (Smith-Hurd 1975), and Ill. Ann. Stat., ch. 10, par. 112, Historical and Practice Notes, at 441-42 (Smith-Hurd 1975).

Generally, the nature and extent of an arbitrator's power will depend upon what the parties agree to submit to arbitration. (5 Am. Jur. 2d *Arbitration and Award* sec. 90 (1962).) An arbitrator exceeds the scope of his power when he decides matters which were not submitted for his resolution. In collective bargaining agreements, the parties typically provide that the arbitrator is to decide disputes involving the application and interpretation of the provisions of the agreement. Such a provision is both the source and the limit of the arbitrator's power. The agreement involved in this case includes such a provision.

Both parties agree, though, that because plaintiff is a

*public body,* the scope of an arbitrator's power may be further limited. Even if a dispute between the parties involves the application and interpretation of provisions of the collective bargaining agreement, it is not arbitrable if it would constitute an impermissible delegation of discretionary public responsibility specifically reposed by law in plaintiff. (*Board of Trustees v. Cook County College Teachers Union, Local 1600* (1976), 62 Ill. 2d 470 (matter of faculty promotion); *Illinois Education Association v. Board of Education* (1975), 62 Ill. 2d 127 (matters of faculty appointment and dismissal).) The parties incorporated this legal principle into the collective bargaining agreement by directing that:

> "The arbitrator shall limit his decision strictly to the application and interpretation of the provisions of this Agreement and he shall be without power or authority to make any decision:
> \*\*\*
>> (2) Limiting or interfering in any way with the powers, duties, and responsibilities of the Board under applicable law."

Neither the legal principle of nondelegability of public authority nor its contractual equivalent, however, applies to the instant dispute submitted to arbitration. Here, the dispute involved the rotational assignment of extra work among qualified teachers. This court, in *Board of Trustees v. Cook County College Teachers Union* (1976), 62 Ill. 2d 470, 480, reasoned that such disputes were arbitrable, provided that the school board retained the authority both to select the extra courses and to offer the extra work only to teachers it had determined to be qualified to do the assigned extra work. The same conclusion applies here. Consequently, the arbitrator's power was circumscribed solely by the contractual mandate that he apply and interpret the provisions of the collective bargaining agreement.

Plaintiff maintains that the arbitrator's interpretation

of the relevant provisions of the agreement was so misguided that it must be vacated. We emphasize, as did the Supreme Court, that "the question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." (*United Steelworkers of America v. Enterprise Wheel & Car Corp.* (1960), 363 U.S. 593, 599, 4 L. Ed. 2d 1424, 1429, 80 S. Ct. 1358, 1362.) We inquire into the merits of the arbitrator's interpretation in an effort to determine only if the arbitrator's award drew its essence from the agreement so as to prevent a manifest disregard of the agreement between the parties. See *Ludwig Honold Mfg. Co. v. Fletcher* (3d Cir. 1969), 405 F.2d 1123, 1125-28, and *Teamsters Local Union No. 394 v. Associated Grocers of Iowa Cooperative, Inc.* (Iowa 1978), 263 N.W.2d 755, 757-58, for a lengthy discussion of the limited scope of review.

We begin by noting that each of the parties argues vigorously that the agreement is unambiguous in its respective favor. Plaintiff asserts that the obvious intention of the agreement was to assess rotation points only when a teacher received "extra work" beyond his regular work assignments. Defendant, on the other hand, argues that the agreement clearly refers to "extra pay" in the computation of rotation points. It is not surprising to find persuasive textual support for each interpretation because, in the typical situation, each interpretation would promote the same aims and produce identical results. Typically, a teacher who receives extra pay above his base rate of pay for a given semester (defendant's approach) derives such pay from extra work beyond his regular assignments (plaintiff's approach). Under either approach, the teacher who did not receive such extra work and the com-

mensurate extra pay during that semester would be given priority for future extra-work assignments.

Because the fall semester of the 1975-76 school year was extended for two weeks due to the illegal strike, however, the otherwise consonant terms "extra work" and "extra pay" took on divergent secondary meanings. (Although the parties knew of the two-week semester extension when the terms were incorporated into the collective bargaining agreement, they did nothing to clarify the ambiguity.) As a result of the extension, the two weeks' "extra pay" which the nonstriking teacher received in excess of the expected semester pay derived not from an "extra work" assignment but from the fulfillment of his regular assignment. The striking teacher received one week's pay below his expected semester pay. Had the semester not been extended, neither the striking nor the nonstriking teacher would have received any rotation points. Even though the nonstriker would still have earned three weeks' salary to which the striker was not entitled, the pay of the nonstriker would not have risen above his base pay for that period.

Were we, for the moment, to construe the agreement in a context unrelated to the illegal strike, we would see that the arbitrator's decision manifests a proper regard for the integrity of the agreement and for the intent of the parties. The agreement evinces an intention to base rotation points on the past amount of extra work assigned. The agreement also sets forth a workable formula, based upon extra pay, for the computation of rotation points. Plaintiff's reasoned position is that if any "extra pay" derives from a source other than from assigned "extra work" it should be disregarded in the computation of rotation points. It is equally plausible, however, that the parties adopted the term "extra pay," both as the ready mathematical equivalent of "extra work," and also as the functional definition of what constitutes "extra work."

The term "extra work" (or the term "base rate of pay," as we noted earlier) was not defined in the agreement, and, as this case attests, denotes no precise application. Accordingly, it was totally reasonable for the arbitrator to rely upon the formula and the term "extra pay" as the operative factor in the agreement.

A secondary consideration supports this conclusion. The agreement set forth a step-by-step procedure for the preparation of rotation lists. One step in the procedure required plaintiff to prepare a list which was to contain all the pay earned by each teacher during the semester. It was plaintiff's refusal to include the pay earned by the nonstrikers which precipitated the grievance by defendant. There is no doubt that plaintiff's action was contrary to the express language in the agreement. It is not clear, however, why plaintiff, consistent with its position, could not have included the pay earned by the nonstrikers, and then adjusted the base rate of pay for the semester to reflect their actual, rather than expected, gross pay for the semester. Such an approach would have attained plaintiff's intended result; *i.e.,* insuring that the pay of the non-strikers during the three-week strike period not be considered "extra pay." Because plaintiff's approach forced it to clearly violate a procedure agreed upon by the parties, plaintiff effectively undermined its own contention that the term "extra work" was to have any operative force in effectuating the intention of the parties.

It is not our intention to impute such an interpretation to the arbitrator. We need not even favor this interpretation to plaintiff's. It suffices that we conclude, as we do, that the arbitrator's award drew its essence from the collective bargaining agreement. If it were not for the involvement of an issue of overriding public policy, our inquiry would end here and we would not disturb the arbitrator's award.

An arbitration award may not stand, however, if it

results in the contravention of paramount considerations of public policy. (see *Local 453, International Union of Electrical Workers v. Otis Elevator Co.* (2d Cir. 1963), 314 F.2d 25, *cert. denied* (1963), 373 U.S. 949, 10 L. Ed. 2d 705, 83 S. Ct. 1680; *Goodyear Tire & Rubber Co. v. Sanford* (Tex. Civ. App. 1976), 540 S.W.2d 478; Blumrosen, *Public Policy Considerations in Labor Arbitration Cases,* 14 Rutgers L. Rev. 217 (1960); Comment, *Judicial Review of Arbitration: The Role of Public Policy,* 58 Nw. U.L. Rev. 545 (1963).) We recognize that any judicial decision to vacate an arbitrator's award compromises both the parties' interest in the finality of the arbitrator's decision and the underlying public policy in favor of resolving collective bargaining disputes by arbitration. Nevertheless, just as we will not enforce a private agreement which is repugnant to established norms of public policy, we may not ignore the same public policy concerns when they are undermined through the process of arbitration. Even if the arbitrator considered issues of public policy in construing the agreement before him, we may not abdicate to him our responsibility to protect the public interest at stake. Though the parties do not dispute this, they differ markedly as to whether any issues of public policy are at stake.

Plaintiff requests that the court intervene in behalf of the following public policy concerns: (1) The arbitration award favors those who violate the law at the expense of those who comply with the law; (2) the award allows wrongdoers to benefit from their own wrongdoing; (3) the award condones and encourages illegal strikes and flagrant disobedience of court injunctions; and (4) the award undermines cardinal rules of contract construction. Defendant, on the other hand, dismisses the public policy concerns by asserting that because the rotation-point formula is neutral in character, the arbitrator's award does not give priority in the assignment of extra work to the

striking teachers. We avail ourselves of the extremes of the two positions in an attempt to pinpoint the actual impact of the arbitrator's award on issues of public policy.

We do not regard the award to be neutral in its respective application to strikers and nonstrikers. The unavoidable effect of the award is to comprehensively realign the priority system for extra-work assignments to the advantage of the unlawfully striking teachers. It is not as if a disproportionate number of unlawful strikers coincidentally benefited, as might have been the case, if, for instance, the priority system were based on merit or seniority and the fortuitous consequence of an award favored them. Here, the intolerable unfairness is that the award necessarily benefited all unlawful strikers at the relative expense of all nonstrikers, and that the imbalance would not have occurred but for the illegal activity.

This court has often stated: "There is no precise definition of public policy, and consequently no absolute rule by which a contract can be measured or tested to determine whether or not it is contrary to public policy. Each case, as it arises, must be judged and determined according to its own peculiar circumstances." (*Zeigler v. Illinois Trust & Savings Bank* (1910), 245 Ill. 180, 193, quoted with approval in *First Trust & Savings Bank v. Powers* (1946), 393 Ill. 97, 102, and in *Groome v. Freyn Engineering Co.* (1940), 374 Ill. 113, 124.) Illinois courts have repeatedly expressed a reluctance, long-established in the maxims of the common law, to allow persons to profit from their intentionally committed wrongful acts. (*State Farm Life Insurance Co. v. Smith* (1977), 66 Ill. 2d 591, 595; *Bailey v. Retirement Board of the Policemen's Annuity & Benefit Fund* (1977), 51 Ill. App. 3d 433, 437-38; *Haralampopoulos v. Capital News Agency, Inc.* (1966), 70 Ill. App. 2d 17, 24.) The injustice which results when persons gain advantage from their illegal acts is graphically illustrated in this case. We need not belabor the

point that the illegal activity involved here directly assailed the authority of the judicial system. What we do emphasize is that the benefit gained in the wake of the illegal activity is directly at the expense of those who refrained from engaging in the illegal activity. In light of the integral role of the courts in averting strikes of this nature, we cannot endorse a result which prejudices only the non-striking teachers. Because the arbitration award dictates so unjust a result, it must be vacated as being repugnant to public policy.

Accordingly, we reverse the judgment of the appellate court and affirm the judgment of the circuit court.

*Appellate court reversed;*
*circuit court affirmed.*