BOARD OF EDUCATION, NORTH PALOS ELEMENTARY SCHOOL DISTRICT NO. 117, Plaintiff-Appellee, *v.* CAROLE WILLIAMS *et al.*, Defendants-Appellants.

First District (4th Division)   No. 82—1979

Opinion filed September 22, 1983.

Wayne Schwartzman and Dale D. Pierson, both of Hirsh & Schwartzman, P.C., of Chicago, for appellants.

Alan T. Sraga, of Scariano, Kula & Associates, P.C., of Chicago Heights, for appellee.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, the Board of Education of North Palos Elementary School District No. 117 (Board), filed an action in the circuit court of Cook County seeking a stay of arbitration and a declaratory judgment against defendants, the North Palos Education Association, IEA-NEA (Association) and two of its officers, Carole Williams and Eileen Grimmer. A dispute concerning class substitution and teacher evaluation had resulted in the Association's filing grievances with the Board on behalf of two member teachers, William Englemann and Barbara Dahlkemper. After the Board denied both grievances, the Association, following the procedure outlined in the Professional Negotiation Agreement (PNA) between the parties, submitted the grievances to arbitration. The Board's suit sought a stay of arbitration and a declaratory judgment that the grievances were inarbitrable.

Both the Board and the Association filed cross-motions for summary judgment with supporting affidavits and memoranda; the trial court granted the Board's motion for summary judgment, denied the motion of the Association, and then denied the Association's motion to vacate. The Association has appealed, claiming that the trial court erred by (1) deciding the issue of arbitrability instead of leaving that initial question to the arbitrator, and (2) holding that the grievances seeking to enforce two provisions of the PNA were inarbitrable.

We reverse the trial court's entry of summary judgment in favor

of the Board and remand with directions to enter summary judgment in favor of the Association. We find no disputed issue of material fact pertaining to either grievance.

FACTS

William Englemann and Barbara Dahlkemper were teachers at Conrady Junior High School, one of the schools in District No. 117 whose faculty was covered by the PNA, a collective bargaining agreement between the teachers and the Board. The provisions of the PNA pertinent to this appeal are as follows:

"II. PROFESSIONAL QUALIFICATIONS AND ASSIGNMENTS

\* \* \*

2.5 EXTRA-CURRICULAR ASSIGNMENTS

Any assignments in addition to the normal school day during the regular school term shall not be obligatory but shall be with the consent of the teacher.

\* \* \*

III. TEACHER EVALUATION

3.1 NOTIFICATION - ASSIGNED AND TRAVELING TEACHERS

Within 20 days after the beginning of each school term the building principal, or immediate supervisor, shall acquaint each teacher under his supervision with the teacher evaluation procedures, standards and instruments, and \*\*\* shall attempt to explain the evaluation process in sufficient detail so that a teacher can reasonably know what is expected \*\*\*.

\* \* \*

IV. TEACHER RIGHTS - BOARD RIGHTS

\* \* \*

4.12 BOARD AUTHORITY

The Board, on behalf of the electors of the District, retains and reserves the ultimate responsibilities for proper management of the District \*\*\* including but not limited to the responsibilities for the right:

1. To maintain executive management and administrative control of the District \*\*\* and the professional activities of its employees \*\*\*;

\* \* \*

5. To determine class schedules, non-teaching assignments, the hours of instruction, and the duties, responsibilities, and assignments of faculty members.

* * *

## VII. TEACHING HOURS AND ASSIGNMENTS
* * *

### 7.2 VOLUNTARY INTERNAL SUBSTITUTION

Any teacher who accepts a class above the normal assigned load shall be compensated at the rate of five dollars ($5.00) per hour. (Jr. High per period);
* * *

### 7.3 ADDITIONAL LOAD COMPENSATION

If a teacher shall teach more than the normal teaching load as set forth in this agreement, said teacher shall receive additional compensation on an hourly basis. This amounts to 0.07722 percent of the annual salary per hour.

This section pertains only to Jr. High School teachers who agree to teach each day an additional subject in lieu of the scheduled preparation period.
* * *                                    .

## VIII. PROFESSIONAL GRIEVANCE PROCEDURES
### 8.1 DEFINITION

A grievance shall mean a complaint that there has been an alleged violation, misinterpretation, or misapplication of any provision of this Agreement.
* * *

### 8.3 PROCEDURES
* * *

E. *Fifth step.* *** [I]f the grievance is not settled in accordance with the foregoing procedure, the Association (but not the teacher) may refer the grievance to arbitration ***.

The Association or the Board may submit the grievance to final and binding arbitration under the Voluntary Labor Arbitration Rules of the American Arbitration Association ***.

The arbitrator shall have no right to amend, modify, nullify, [or] ignore *** the provisions of this Agreement or any applicable Board policy. *** The arbitrator shall be without power to make decisions contrary to or inconsistent with or modifying or varying in any way the applicable laws and rules and regulations having the force and effect of law."

In addition, the Board cites the following sections of the School Code as the source of powers beyond those contained in the PNA and thus not subject to arbitration:

"Sec. 10—22.10. Control and supervision of school houses and school grounds. To have the control and supervision of all pub-

lic school houses in their district ***." Ill. Rev. Stat. 1979, ch. 122, par. 10—20.5.

"Sec. 10—20.5. Rules. To adopt and enforce all necessary rules for the management and government of the public schools of their district." Ill. Rev. Stat. 1979, ch. 122, par. 10—20.5.

"Sec. 24—24. Maintenance of discipline. Teachers and other certificated educational employees shall maintain discipline in the schools ***." Ill. Rev. Stat. 1979, ch. 122, par. 24—24.

The normal school day for most teachers at Conrady consisted of eight periods: six teaching periods, one preparation period, and one period divided between homeroom and lunch. Englemann, Williams, and Grimmer, all of whom were teachers in the district and past or present officers of the Association, filed affidavits stating that when it was necessary to find a substitute teacher for a single class period, the pattern and practice of the Conrady administration had been, first, to use administrators to fill in for absent teachers. If none was available, teachers in the subject area would be canvassed to find a volunteer to teach during his preparation period. Only if no available teacher volunteered would the administration order a teacher to surrender his preparation period and take the class. The affidavits of Englemann and Grimmer stated that to their knowledge, during their terms as grievance chairpersons and as teachers at Conrady, either administrators or volunteer teachers had covered all internal substitution requirements.

On the other hand, the affidavit filed by the principal at Conrady stated that the only procedures employed to find emergency substitutes were (1) to ask for volunteers and then (2) to assign a qualified teacher according to a "draft rotation system"; both Englemann and Dahlkemper were at the "top of the draft rotation list" on the days they were ordered to substitute after it was ascertained that there was "an insufficient number of volunteers from the Conrady staff." We note in this regard that on the day he was ordered to substitute during the second period, Englemann was the first mathematics teacher to enter the building; he was first requested to take the extra class upon his arrival at 7 a.m., then twice again during his first period class.

In addition to her grievance that she had been ordered to substitute before any request was made for available administrators or faculty volunteers, Barbara Dahlkemper also protested the notation on her evaluation report that she should "accept internal substitution without hesitation as necessary." Dahlkemper alleged that, according to the PNA, internal substitution was voluntary; therefore, in viola-

tion of section 3.1 of the agreement, she had not been informed in advance that a willingness to waive her contractual rights would be used as a criterion for evaluating her.

As grievance committee chairperson, Eileen Grimmer had the responsibility to process the three grievances. In order to ascertain whether or not Englemann and Dahlkemper had legitimate complaints, Grimmer requested lists of (1) administrators who had been absent on the days in question and therefore were not available to substitute, (2) regular substitutes, and (3) teachers as officially scheduled on the "draft rotation system." All three requests were denied.

Both parties filed motions for summary judgment on the ground that the case presented no issues of fact, only issues of law. The Board argued that even if it had signed the contract including the voluntary internal substitution provision and had acted accordingly in past emergency substitute situations, it could not legally agree to the provision because, as a matter of law, internal substitution of teachers involved the discretionary, nondelegable power to "maintain discipline" and "enforce all necessary rules for the management and government of the public schools of their district." Because the School Code reserved such powers to the Board, an arbitrator had no power to modify the applicable law; the grievances concerning substitution therefore were inarbitrable, as was the grievance concerning teacher evaluation and notification of standards.

In response, the Association maintained that a grievance concerning voluntary internal substitution was arbitrable because control over internal substitution was not one of the nondelegable discretionary powers established through judicial interpretation of the School Code. Further, a grievance concerning notification of standards of teacher evaluation was equally arbitrable because no challenge was being made to the Board's exclusive right to conduct teacher evaluations.

OPINION

I

■ The first issue presented for review concerns the question whether or not the initial decision on the arbitrability of a given dispute should be made by the arbitrator. In the instant case, the parties to the PNA incorporated a provision into the Agreement that gave an arbitrator authority to decide disputes in accordance with the Agreement, applicable rules, regulations and laws, or Board policy. (See section 8.3E quoted above.) "Generally, the nature and extent of an arbitrator's power will depend upon what the parties agree to submit to

arbitration." (*Board of Trustees v. Cook County College Teachers Union* (1979), 74 Ill. 2d 412, 419, 386 N.E.2d 47, 50.)

> "If the dispute is clearly within the arbitration clause, the court should order arbitration. However, if the dispute is clearly not within the clause *** then there is no agreement to arbitrate, and the court should deny arbitration.
>
> \* \* \*
>
> Where there is an agreement to arbitrate and its scope is reasonably in doubt, the issue of arbitrability should be initially determined by the arbitrators ***." (*School District No. 46 v. A. J. Del Bianco* (1966), 68 Ill. App. 2d 145, 154-55, 215 N.E.2d 25, 30.)

The Association cites *Board of Education v. Johnson* (1974), 21 Ill. App. 3d 482, 315 N.E.2d 634, and *Board of Education v. Illinois Education Association* (1981), 100 Ill. App. 3d 1026, 427 N.E.2d 789, as authority for its contention that the initial decision whether or not the instant grievances were arbitrable should have been left to the arbitrator, not the court.

An examination of those cases reveals that the decision on the arbitrability issue in *Board of Education v. Illinois Education Association* was based solely on *Johnson*; the same issue in *Johnson* was decided on the authority of *Board of Education v. Champaign Education Association* (1973), 15 Ill. App. 3d 335, 304 N.E.2d 138, which in turn was based on the language in *Del Bianco* quoted above. Such reliance on *Del Bianco* is misplaced, for that case concerned interpretation of a contract unfettered by the additional limitations of the School Code (Ill. Rev. Stat. 1979, ch. 122, par. 1—1 *et seq.*). "Even if a dispute between the parties involves the application and interpretation of provisions of the collective bargaining agreement, it is not arbitrable if it would constitute an impermissible delegation of discretionary public responsibility specifically reposed by law in [the Board]." *Board of Trustees v. Cook County College Teachers Union* (1979), 74 Ill. 2d 412, 420, 386 N.E.2d 47, 50.

Section 8.3E of the PNA, quoted above, specifically invokes the authority and procedures of the Rules of the American Arbitration Association and thereby the Uniform Arbitration Act. (Ill. Rev. Stat. 1979, ch. 10, par. 101 *et seq.*) Section 2 of the Act provides that a party showing an agreement to arbitrate and the opposing party's refusal to arbitrate may request that the court compel arbitration. "[T]he court shall order the parties to proceed with arbitration, but if the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so

raised and shall order arbitration if found for the moving party, otherwise, the application shall be denied." Ill. Rev. Stat. 1979, ch. 10, par. 102.

The Board consistently has maintained that the grievances at issue are inarbitrable. Consequently, the trial court followed the procedure specified in Section 2 of the Act and "proceed[ed] summarily to the determination of the issue so raised."

> "[T]he principle that arbitration must first be had in each and every grievance without the right of initial review by the courts is not only contrary to law but would necessarily result in a waste of time and money.
>
> We also note it has been repeatedly held the issue as to whether any contract requires arbitration by its terms should initially be decided by a court and not by an arbitrator. *Kaiser-Ducett Corp. v. Housewrights, Inc.* (1977), 48 Ill. App. 3d 589, 592, 363 N.E.2d 97, and cases there cited." (*Board of Trustees v. Cook County College Teachers Union* (1980), 87 Ill. App. 3d 246, 252, 408 N.E.2d 1026, 1031.)

Accordingly, we affirm the trial court's holding in the instant case that the issue of arbitrability should be decided by the court, not the arbitrator.

## II

■ The second question presented for review addresses the issue of the arbitrability of the Englemann and Dahlkemper grievances. The Board argued and the trial court agreed that both internal substitution and teacher evaluation are matters within the nondelegable discretion of the Board. After reviewing the pertinent portions of the School Code, the PNA, and the actions of the Board and the two teachers involved, we conclude that, in the instant case, neither dispute challenged the Board's nondelegable discretion. We therefore find that the trial court erred in entering summary judgment in favor of the Board and should have entered summary judgment in favor of the Association on the issue of the arbitrability of the Englemann and Dahlkemper grievances.

We note initially that the demand for arbitration filed by the Association with the American Arbitration Association characterized the nature of the dispute as follows: "The contract was violated when (1) the grievants were required to substitute internal[ly] (involuntarily), and (2) when such requirement denied the grievants use of their preparation period." The remedy sought was (1) "Cessation of the practice of ordering teachers to involuntarily substitute internally. (2) Replace-

ment of the preparation period denied each grievant at the time of the contractual violation." The complaint for a declaratory judgment and stay of arbitration filed by the Board in response asserted the inarbitrability of the grievances and cited as authority the School Code provisions quoted above as well as section 19.8 of the PNA, which summarized the Board's position that it had not "abdicate[d] or delegate[d] the obligations and responsibilities impressed upon it by law ***." Had the trial court been limited to the above pleadings in its consideration of the cross motions for summary judgment, there is no doubt that the nondelegable duties to assign teachers, to manage and govern the schools in the district, and to maintain discipline as imposed by the School Code would have mandated summary judgment for the Board, the "Voluntary Internal Substitution" provision notwithstanding.

However, it is clear that neither the Board nor the Association viewed the matter in such a narrow fashion. While it is true that the form and wording of the grievances as filed appear to deny the Board any right to order involuntary substitution, the substance of the affidavits filed on behalf of both parties significantly qualifies that wording.

First, several teachers on the contract negotiating team presented evidence of the heated discussions that surrounded the inclusion of the words "Voluntary Internal Substitution" in the PNA. If the Board assumed that it had the unfettered right to order teachers into classrooms without following some agreed-upon procedure, we fail to see the reason why the Board attempted several times to remove the word "voluntary" from the contract.

Second, Albert J. Bialik, principal of Conrady, stated that the past practice established by the Board was to seek a volunteer substitute from among those qualified to teach the subject area before any teacher was ordered to substitute; only if no volunteer was found would the involuntary substitute be chosen according to a "draft rotation list." His statement, with the exception of the mention of the "draft rotation list," is consistent with the teachers' understanding of the voluntary substitution provision in the contract. The affidavit filed by grievance chairperson Grimmer stated, "It was the NPEA goal in processing said grievances to force the administration to honor the contract and most importantly to ask for volunteers first before ordering teachers to substitute." Contract negotiator Keller's affidavit stated, "During the negotiations in which I participated it was the NPEA's position that it was important for teachers to retain their planning period and that they should not be required to surrender it

for purposes of internal substitution until the administration showed that it had exhausted its efforts to find volunteer substitutes. This is the meaning that the NPEA gives to [the Voluntary Internal Substitution provision] of the contract."

Finally, the memorandum filed by the Association in support of its motion for summary judgment stated, "It is the grievant's contention that there has been, and is a practice and policy of the Board which mandates that ***[i]f no teachers volunteer to internally substitute, then and only then will the administration *order* teachers to internally substitute." (Emphasis in original.) Keeping in mind that "[i]n deciding whether to grant summary judgment the trial judge is required by statute to consider the pleadings, depositions, and affidavits filed in support of and in opposition to the motion (Ill. Rev. Stat. 1981, ch. 110, par. 57(3))" (*Artis v. Fibre Metal Products* (1983), 115 Ill. App. 3d 228, 233, 450 N.E.2d 756, 759-60), we necessarily find that the Conrady administration tacitly agreed that its established policy was to seek volunteers before ordering teachers into classroom, thus acknowledging that teachers had a contractual right to a preparation period in all but extreme circumstances. Similarly, the affidavits filed by the teachers indicate that the faculty tacitly accepted the Board's absolute right to order teachers into classrooms in emergency situations.

After looking at all the documents filed with the motions for summary judgment and particularly noting that the original response by the grievance chairperson was to request lists of faculty and administration who had refused to substitute as well as a copy of the "draft rotation list," we conclude that the heart of this disagreement is not whether the Board had the authority to order a teacher to substitute in an otherwise unsupervised class, but rather the procedure to be followed before such involuntary substitution was ordered. Board policy, which was shielded from an arbitrator's power of amendment or modification by section 8.3 of the PNA quoted above, arguably had established a procedure acceptable to all parties. Consequently, we adhere to the reasoning and result set forth in *Classroom Teachers Association v. Board of Education* (1973), 15 Ill. App. 3d 224, 304 N.E.2d 516, that because no contractual provision, including Board policy, restricted the power of the Board to comply with its statutory duties, but instead merely provided for certain procedures to be followed consistent with ordinary concepts of fairness, the grievances concerning involuntary internal substitution are arbitrable. Even the Board's own argument, that the extra work assignments were made according to a "draft rotation system," was found in *Board of Trustees v. Cook*

*County College Teachers Union* (1976), 62 Ill. 2d 470, 343 N.E.2d 473, to support that court's decision that whether or not the rotation system had been followed presented an arbitrable issue.

No provision of the School Code controls the selection of substitute teachers from within the body of already-hired, qualified teachers. Both parties agree that the Board has ultimate authority to ensure that all classrooms are staffed. Therefore, resolution of the issue whether the administration had the authority to order a teacher to substitute internally without complying with provisions of the PNA or with its own policy and past practice is one for an arbitrator to decide: "[T]he Arbitration Act should apply to all grievances *** absent an express exclusion contained in an agreement of the parties. *** [The courts have] clearly determined that the question of interpretation of the collective bargaining agreement is a question for the arbitrator and it is the arbitrator's interpretation or construction of the contract that has been bargained for by the parties." (*Board of Education v. Illinois Education Association* (1981), 100 Ill. App. 3d 1026, 1028, 427 N.E.2d 789, 790.) We therefore hold that the issue of internal substitution should be decided by arbitration.

### III

The second dispute, that of the administration's obligation to inform a teacher before evaluation what standards will be applied, we similarly find to be arbitrable. It is clear that, under the authorities cited above, the Board has absolute authority to determine the necessary qualifications of teachers and the standards by which teachers are judged. Section 3.1 of the PNA simply provides that before a teacher is evaluated, the evaluator shall "acquaint each teacher under his supervision with the teacher evaluation procedures, standards, and instruments" and "attempt to explain the evaluation process in sufficient detail so that a teacher can reasonably know what is expected ***."

> "No provision of the agreement restricts the power of the Board to hire, discharge or transfer nor requires the Board to delegate authority. *** The [evaluation] provisions do no more than establish certain procedures, consistent with ordinary concepts of fairness, which procedures the Board agreed to follow. None of the procedures limit the power of the board to exercise its absolute discretion unfettered by any considerations save fundamental fairness." *Classroom Teachers Association v. Board of Education* (1973), 15 Ill. App. 3d 224, 228, 304 N.E.2d 516, 519.

It is true that in *Illinois Education Association v. Board of Education* (1975), 62 Ill. 2d 127, 340 N.E.2d 7, the supreme court held that compliance with statutory requirements for termination of a teacher's services was sufficient, notwithstanding more elaborate procedures for evaluation outlined in the applicable collective bargaining agreement. We do not find that case to be dispositive of the evaluation dispute at issue here.

■■ The actual issue in *Illinois Education Association v. Board of Education* was the authority of an arbitrator to award an employment contract as a remedy for a violation of the collective bargaining agreement. Clearly, an arbitrator has no such authority, for awarding an employment contract is one of the powers specifically reserved to a school board by the Illinois School Code.

In contrast, the instant case shows no demand by the Association that the Board relinquish any of its statutory powers; all that is requested is that the Board abide by the procedures it agreed to follow while exercising its nondelegable authority. We consequently conclude that the issue of informing a teacher of the applicable standards of evaluation is one properly delegable to an arbitrator, involving as it does no statutory grant of power to the Board.

In light of all the foregoing, we reverse the decision of the trial court on the issues of the arbitrability of the two grievances and remand the case with instructions to order the parties to proceed to arbitration. The arbitrator's authority to interpret and implement the Agreement shall not extend to any nondelegable rights and duties vested in the Board by statute.

Affirmed in part; reversed in part; and remanded with directions.

ROMITI, P.J., and JIGANTI, J., concur.