HOLLISTER INCORPORATED *et al.*, Plaintiffs-Appellants, v. ABBOTT LABORATORIES, Defendant-Appellee.

First District (3rd Division). Nos. 85—2940, 85—3702 cons.

Opinion filed May 18, 1988.—Rehearing denied June 27, 1988.

David M. Allen, of Chicago, for appellants.

C. Lee Cook, Jr., Robert F. Ward, Alan I. Greene, and Lynn P. Hagman, all of Chicago, and Mark E. Barmak and Edward L. Michael, both of North Chicago, for appellee.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiffs, Hollister Incorporated (Hollister), and Hollister Overseas, Ltd. (Overseas), appeal from a judgment of the circuit court of Cook County confirming an arbitration award in favor of defendant, Abbott Laboratories (Abbott). On appeal, Hollister and Overseas argue that the circuit court erred in holding that the arbitrators did not, and as a matter of law could not, exceed their power in arbitrating the disputes between Hollister, Overseas and Abbott. Hollister and Overseas contend that: (1) the arbitrators violated the doctrine of *functus officio* when they ordered Hollister and Overseas to negotiate in good faith with Abbott and then on a later date set the "Agreed Purchase Levels" themselves; (2) the arbitrators exceeded their powers when they determined that they would set the "Agreed Purchase Levels" and (3) the arbitrators exceeded their powers when they required that adjustments for currency rate fluctuations be made in setting certain prices on products sold by Hollister and Overseas to Abbott. We affirm.

Hollister, and its wholly owned subsidiary Overseas, manufactures and sells ostomy devices and other specialty medical products. Hollister maintains its principal office in Libertyville, Illinois, while Overseas' only manufacturing facility is in Ballina, Ireland. Abbott is headquartered in North Chicago, Illinois, and manufactures and distributes various medical products throughout the world. Abbott and Hollister formed a contractual business relationship in 1970. Pursuant to a series of contracts, Abbott developed markets outside of the United States and Canada for medical specialty products manufactured by Hollister.

In 1977, Hollister and Abbott entered into two long-term contracts which were to extend through 1991. These agreements were known as the "International Marketing Agreement" (IMA) and the "International Supply Agreement" (ISA). The IMA conferred upon Abbott the exclusive right to market and distribute Hollister's products which were manufactured in Hollister's plants located in the United States. The ISA agreement, on the other hand, related to products sold to Abbott that were manufactured in Overseas' Ballina facility.

Both the IMA and the ISA provided that in the event the parties had controversies they could not settle, the differences would be arbitrated under the rules of the American Arbitration Association. The IMA and ISA further provided, respectively, that they be "construed in accordance with the laws of the State of Illinois" and "construed, interpreted, applied and enforced in accordance with the laws of the State of Illinois, including Article 2 of the Uniform Commercial Code."

After approximately four years, certain issues between Hollister and Overseas and Abbott could not be agreed upon. One issue was the parties' inability to agree upon the "Agreed Price Levels" (APLs) necessary for Abbott to meet in 1984 and the remaining years of the contract. Under the terms of the IMA, APLs were defined as "the minimum unit quantity required to be ordered by ABBOTT for a given Product Purchase Group for distribution or resale in a country or area in the Territory in a Contract Year." Under the terms of the IMA, the APLs for the first five years (1977-81) were agreed upon at the inception of the contract. APLs for the following years were to be negotiated by Hollister and Abbott, on a year-by-year basis, five years in advance. The APLs were then to be reduced to writing and incorporated into exhibit "C" of the IMA. The IMA further provided that: (1) if APLs were not agreed upon, reduced to writing and incorporated as exhibit "C," Hollister had the right to "exclude such country

or area from this Agreement upon expiration of the remaining Contract Years" and (2) the agreement "shall continue for a period of fifteen (15) years ***; PROVIDED HOWEVER, that Agreed Purchase Levels for each Contract Year after the first five (5) Contract years shall be renegotiated." The terms of the ISA were essentially the same.

Another issue the parties could not agree upon was the currency adjustments that Overseas was or was not to make in setting the dollar prices for products sold to Abbott from Overseas' Ballina facility. With respect to pricing, the IMA provided that Overseas could adjust its prices to Abbott on an annual basis. However, the percentage change in those prices to Abbott was limited by the percentage change in Overseas' manufacturing costs.

For the first two years of the contract, prices were set on an *ad hoc* basis because the Ballina plant had just begun its full operations. For the years of 1979, 1980 and 1981, the parties used a method known as the Gunderson Method to set prices. Under this method the percentage change in Overseas' manufacturing costs was calculated. The manufacturing costs percentage increase was then multiplied by a currency factor which was based upon the yearly change in the six-month average exchange rates between Irish currency and United States dollars.

Overseas records all of its manufacturing costs in the currency used in Ballina: Irish Pounds (punts). However, the sales prices to Abbott are denominated in United States dollars. When the parties attempted to set the 1982 prices, the dollar had strengthened significantly against the punt. As a result, if the Gunderson Method were used, Overseas' dollar prices to Abbott would have to be reduced even though Overseas' punt manufacturing costs were rising. Therefore, in calculating the prices for 1982, Overseas did not use a currency factor but, instead, calculated the increase in its manufacturing costs and set its prices according to the provision in the ISA relating to the pricing issue. Abbott objected that Overseas did not use a currency factor to adjust its 1982 prices and refused to pay the 1982 prices. Abbott then paid the 1981 prices that were currency adjusted for the years of 1982, 1983, 1984 and a portion of 1985. These unresolved issues were ultimately submitted to arbitration in June 1982.

At the arbitration hearing, the arbitration panel heard the testimony of 24 witnesses, eight independent experts and 16 present or former officers and employees of Hollister or Abbott. The arbitrators further heard the testimony of Hollister's current president, its director of international marketing, its vice-president of finance and its

president in 1977, the year in which the present contracts were negotiated and entered into. In their award of February 25, 1985, with respect to the APLs, the arbitrators found that Hollister "did not negotiate in good faith respecting Agreed Purchase Levels for the years 1984 and following." The arbitrators ordered Abbott and Hollister to negotiate APLs for the years 1985-89, further providing that if Abbott and Hollister could not agree upon the APLs in writing by July 31, 1985, the arbitrators would take any additional measures they deemed appropriate.

With respect to the pricing issue, the arbitrators in their award ruled that "the Gunderson Method should have been and should be employed," and ordered that Overseas' prices for 1982 and the years thereafter be recomputed with a currency adjustment under the Gunderson Method. The arbitrators stated:

> "[T]he [Gunderson Method] represent[ed] the course of conduct employed between the parties during the period of the contracts in question up to the time that [Overseas] unilaterally and without notice chose to change the foregoing method of pricing used by the parties pursuant to prior practice."

Based upon the recomputation, the arbitrators ordered that any money due from one party to the other for 1982, 1983 and 1984 be paid without interest.

On or about August 8, 1985, the parties notified the arbitrators that no agreement could be reached as to the appropriate APLs. Therefore, on August 8, the arbitrators determined that since the parties could not agree upon APLs, the arbitrators would set the APLs.

Following the arbitrators' mandate that Overseas use the Gunderson Method, and its decision to set the appropriate APLs, Hollister and Overseas filed an application to vacate the award in the circuit court of Cook County. Abbott filed a cross-motion to confirm the award. The court denied Hollister and Overseas' request to vacate the arbitrators' award. The court further confirmed the award's pricing mechanism and found that the arbitrators' award mandating the use of the Gunderson Method was not "irrational or at variance with any fair reading of the contract." In its finding the court stated:

> "[T]he burden is not on the prevailing party or the reviewing court to justify the arbitration award. The party who asserts that the arbitration award is somehow invalid has the burden of proving such contention by clear, strong and convincing evidence. All reasonable presumptions are indulged in favor of an arbitration award.

\* \* \*

No clear, strong and convincing evidence has been presented in support of any of the multiple attacks made on the award by Hollister. Nothing has been offered which overcomes the presumption of validity."

The court entered two judgments in favor of Abbott: one judgment in the amount of $2,421,894, with $69,339 in interest, and the other in the amount of $7,313,000, with interest to be paid at 9%. The first judgment of October 4, 1985, represented sums due Abbott under the recomputation for the years 1982 through 1984. This judgment was certified per Rule 304 (107 Ill. 2d R. 304) and appealed as case No. 85—2940. The second judgment of December 18, 1985, represented overpayments for a portion of 1985 and was appealed as case No. 85—3702. The two cases were consolidated by this court for appeal.

Hollister first argues that the arbitrators violated the doctrine of *functus officio* when they ordered Hollister and Overseas to negotiate in good faith with Abbott and then on a later date issued an award to set the APLs themselves. We disagree.

■ The doctrine of *functus officio* stands for the proposition that once arbitrators issue an award, their powers end and they have no authority or jurisdiction thereafter to modify, annul, revoke or amend the award; nor can they make a new award on the same issue. *Bayne v. Morris* (1863), 68 U.S. (1 Wall.) 97, 17 L. Ed. 495.

In support of its position, Hollister cites as authority the cases of *Lewis v. County of Suffolk* (1979), 70 A.D.2d 107, 419 N.Y.S.2d 680, and *Chaco Energy Co. v. Thercol Energy Co.* (1981), 97 N.M. 127, 637 P.2d 558. In *Lewis*, the dispute involved certain increases of salary to be paid by the County of Suffolk to its employees. These increases were to paid pursuant to a collective bargaining agreement between the Suffolk Chapter of the Civil Service Employees Association (CSEA) and the county. The grievance was confirmed by resolution of the Suffolk County legislature. Immediately thereafter, the county executive said that the resolution was not valid and requested the CSEA to negotiate a new collective bargaining agreement. While the new agreement was pending, the county refused to honor the payments already determined to be due and the employees filed grievances which culminated in arbitration. In its award, the arbitrator determined that the new collective bargaining agreement did not change the old agreement and the payments were therefore still due and owing. *Lewis*, 70 A.D.2d 107, 109-10, 419 N.Y.S.2d 680, 681-82.

Three days after the arbitrator's decision in *Lewis*, the arbitrator granted a "Motion to Reopen Hearing" made by the county. The

county alleged that during the arbitration proceedings the arbitrator made a statement discouraging one party from submitting certain evidence because it was "irrelevant and unnecessary" to the arbitrator's decision. Thus, the arbitrator granted the reopening "in order to make certain that the final award in the matter will not be found defective because of any failure of the arbitrator to afford the parties a full and fair hearing." 70 A.D.2d 107, 110, 419 N.Y.S.2d 680, 682.

In *Lewis*, the court could not determine if the arbitrator's statement was made because the arbitration proceedings were not transcribed. Thus the court remanded the case for a hearing to determine if the arbitrator in fact made the statement. The court indicated that if after a hearing it was determined that the statement was made, the arbitrator's actions would have constituted misconduct thus requiring a new arbitration proceeding. However, if the statement was not made, any attempt to reopen the arbitration would fail because the arbitrator would be *functus officio* and have no power to change his award. 70 A.D.2d 107, 113, 419 N.Y.S.2d 680, 684.

In *Chaco Energy Co.*, the parties entered into a "Joint Development and Operating Agreement" which provided for arbitration in the event of a dispute. Shortly after inception of the contract, the parties could not resolve a dispute and Thercol demanded arbitration. Each party appointed an arbitrator and a neutral arbitrator was appointed by the United States District Court for the District of New Mexico. On June 10, 1980, following the arbitration proceedings, the arbitrators telephoned the respective counsel and orally reported the decision. Thereafter, the arbitrators signed the decision and dispersed and mailed copies to the parties. *Chaco Energy Co.*, 97 N.M. at 128, 637 P.2d at 559.

The day after the June 10 decision, the neutral arbitrator in *Chaco Energy Co.* felt that he had erred with respect to a portion of his earlier decision. This neutral arbitrator contacted the other two arbitrators and discussed the matter. Without reopening the proceedings, the arbitrators prepared an amended decision changing a portion of the previous decision and hand delivered copies to the parties on June 12. The trial court confirmed both the original and subsequent amended award. The appellate court reversed the decision of the trial court, holding that the arbitrators were *functus officio* because the June 10 decision was considered by the arbitrators as a final arbitration decision. The subsequent decision was referred to as amended and stated "except as herein *modified* my decision of June 10, 1980, remains in effect." The court concluded that because the arbitrators had executed a binding award and declared their decision to be final,

they were *functus officio* and had no power or authority to proceed further following their June 10 award. 97 N.M. at 128, 637 P.2d at 559.

These two cases are clearly distinguishable from the case at bar. In *Lewis*, the arbitrators had granted their final award and, upon request of the displeased party, thereafter granted a "Motion to Reopen" the arbitration proceedings. In *Chaco Energy Co.*, the arbitrators had made their final award and upon afterthought and reconsideration of one of the arbitrators, issued an "amended" and "modified" award. The case at bar does not involve any motions to reopen the proceedings or any amended or modified awards. To the contrary, in the instant case, no final award was ever issued. The arbitrators stated in their February 25, 1985, award:

> "If APLs for any of the foregoing years are not agreed to in writing by July 31, 1985, for any country, the parties shall inform the arbitrators of their inability to agree and the arbitrators shall take such further measures as are appropriate."

This statement clearly indicates that the award was not final and that the arbitrators maintained jurisdiction to settle the ongoing dispute between Hollister and Abbott.

Thereafter, on August 8, the arbitrators stated:

> "[A]t the time the award was entered back in February, the arbitrators had several options available to them based on what they had found to be conduct of the parties.
>
> * * *
>
> One of them would have been to enter the APLs at that time if it so chose, and make a determination. The other would have been to hold further hearings just with respect to what the APLs should be.
>
> * * *
>
> The panel chose not to pursue either of those routes, because it felt that the determination of the APLs was something that was within the expertise and business interest of all parties. And accordingly, structured its award to enable the parties to try to resolve their own problem, as I hoped they would, as the Panel hoped that it would.
>
> * * *
>
> The term good faith was used in the award as a prod, just as the word diligent might have been used. But the presence or absence of good faith in the negotiations in the panel's view is not determinative at this time as to what the panel's rights are. We find ourselves essentially in the position we were when we

drafted the original award.

* * *

Accordingly, it will be the order of the panel that each side make such submissions as it feels appropriate in order to enable the panel to make a determination as to the APLs."

An arbitrator "may, absent any express limitation, retain jurisdiction to resolve a dispute concerning a contractual provision which calls for negotiation, after the parties have been afforded an opportunity to reach an agreement." (*Board of Education of Dover Union Free School District v. Dover-Wingdale Teachers' Association* (1983), 95 A.D.2d 497, 497-98, 467 N.Y.S.2d 270, 271, *aff'd* (1984), 61 N.Y.2d 913, 463 N.E.2d 32, 474 N.Y.S.2d 716; *Clark v. Courter* (1917), 280 Ill. 590.) Based upon our review of the record, Hollister cannot be heard to argue that the arbitrators violated the doctrine of *functus officio* in later determining to set the APLs for the parties. The arbitrators afforded Hollister and Abbott an opportunity to negotiate in good faith and set their own APLs because of the high business interest at stake. However, this accommodation did not divest or terminate the authority and jurisdiction of the arbitrators to set APLs for the parties in the event that no APLs were mutually agreed upon. Thus, the arbitrators retained jurisdiction to implement their award and Hollister's argument must therefore fail.

Hollister next argues that the arbitrators exceeded their powers when they determined that: (1) they would set the APLs for Hollister and Abbott and (2) they required the parties to use the Gunderson Method in making adjustments for currency rate fluctuations to determine prices of Overseas' products sold to Abbott. Hollister relies upon section 12(a)(3) of the arbitration and awards statute, which provides that the court shall vacate an award where "[t]he arbitrators exceeded their powers." (Ill. Rev. Stat. 1985, ch. 10, par. 112(a)(3).) The record before us evinces that this argument is devoid of merit.

An arbitrator exceeds his powers when he decides matters which were not submitted to him. (*Board of Trustees v. Cook County College Teachers Union, Local 1600, AFT, AFL/CIO* (1979), 74 Ill. 2d 412, 419, 386 N.E.2d 47, 50.) Parties to a contract may agree that any and all disputes arising out of that contract shall be submitted to arbitration. Therefore, when a dispute under such an agreement is submitted to arbitration, the arbitrator is empowered to make an award that will fully settle the dispute. (*Wilcox Co. v. Bouramas* (1979), 73 Ill. App. 3d 1046, 1051, 392 N.E.2d 198, 202.) When parties agree to submit a dispute to arbitration, it is presumed that: (1) the

parties intended that all matters in dispute be decided; (2) in the absence of an express reservation, the parties agreed that everything, both as to law and fact, which is necessary to the resolution of the dispute is within the authority of the arbitrator; and (3) the arbitrator did not exceed his authority. (*Wilcox*, 73 Ill. App. 3d at 1051, 392 N.E.2d at 202.) Furthermore, the scope of an arbitrator's power is governed by the agreement between the parties submitting the matter to arbitration. (*Pillott v. Allstate Insurance Co.* (1977), 48 Ill. App. 3d 1043, 1048, 363 N.E.2d 460, 464.) By mutual agreement of Hollister and Abbott, the arbitration clauses in both the IMA and ISA read as follows:

> "Any controversy or claim which cannot be resolved between the parties, arising out of or relating to this Agreement or the breach thereof, shall be settled by binding arbitration in Chicago in accordance with the laws of the State of Illinois, by an arbitrator or arbitrators appointed pursuant to the Rules of the American Arbitration Association, and said arbitration shall be conducted in accordance with the Commercial Arbitration Rules of said Association. Judgment upon any arbitration award so rendered may be entered in any court having jurisdiction over the party against whom such award is made."

Here, as the arbitration clause indicates, Hollister and Abbott agreed to arbitrate "any controversy or claim *** arising out of or relating to the Agreement." However, Hollister argues that the setting of APLs and currency adjustments to compensate for fluctuations is not covered under this agreement. To support this contention Hollister contends that the other provisions of its agreements with Abbott allow Hollister to: (1) exclude certain countries or areas from the Agreement if no APL is agreed upon; (2) terminate the contract if no APLs could be agreed upon and (3) opt to use the Gunderson Method as an elective and not mandatory means of setting prices based upon exchange rate fluctuations. We disagree.

In the IMA, there is a provision which provides:

> "In the event that HOLLISTER and ABBOTT shall fail to negotiate an Agreed Purchase Level for each Product Purchase Group for any country or area ***, HOLLISTER shall have the right to exclude such country or area from this Agreement ***."

Hollister argues that this provision supports its first two contentions that the arbitrators exceeded their powers. As to the prices based upon exchange rate fluctuations, the provision which Hollister contends supports its position states:

"Base prices *** shall be applicable throughout the next calendar year unless, by mutual agreement of the parties they are adjusted during the year to compensate for currency or exchange rate fluctuations."

In construing the first of these provisions, the arbitrators were faced with interpreting a contract which provided: (1) for binding arbitration in the event that "any controversy or claim" arose that could not be settled by the parties, and (2) for exclusion of countries or areas for which APLs could not be mutually set. The two provisions were in contravention of each other and required the arbitrators to interpret an ambiguous contract.

With respect to the second provision, the arbitrators interpreted the contract to require the use of an exchange factor to translate manufacturing costs, measured in punts, to the same currency as prices, measured in dollars. The arbitrators then surmised that the Gunderson Method "should have been and should be employed." This decision was based primarily on the fact that the contract did not expressly preclude use of a currency factor and that in the past years when base prices were set, the parties used the Gunderson Method as the most agreeable, reliable and predictable means of setting prices and compensating for fluctuations in the currency rates.

■■ Hollister does not argue that it was not within the province of arbitrators to interpret the contract. Nor does Hollister allege any fraud or misconduct on the part of the arbitrators. To the contrary, Hollister is simply displeased that the arbitrators' interpretation was not in its favor and now asserts that the arbitrators exceeded their powers. As Hollister was well aware when it included an arbitration provision, it is the responsibility of the arbitrator to interpret the contract in resolving issues submitted to it for arbitration. Moreover, an arbitrator's award is presumed valid. Therefore, to successfully challenge an arbitration award, the challenger must show by clear, strong and convincing evidence that the arbitrator exceeded its powers in rendering an award. *Burd, Inc. v. Stoneville Furniture Co.* (1985), 134 Ill. App. 3d 149, 154, 479 N.E.2d 962, 965.

■■ The standard of review that we are bound to exercise in reviewing this arbitration award is a more restrictive and limited one than that employed in reviewing a trial court's decision. We, as judges, have no power to reach and determine the merits of an arbitration award merely because of strong disagreement with the arbitrator's interpretation of the contract. *E. I. Dupont de Nemours & Co. v. Grasselli Employees Independent Association of East Chicago, Inc.* (7th Cir. 1986), 790 F.2d 611, 614-15.

Applying this standard, we cannot say that Hollister has shown by clear, strong and convincing evidence that the arbitrators unfairly or erroneously interpreted the conflicting provisions of the contract. Moreover, we cannot say that based upon the evidence before us that the arbitrators' reliance on past methods used in setting base prices and their subsequent construction of the contract was erroneous. Prior to rendering their award, copious and technical evidence was presented to the arbitrators in the form of 24 witnesses, eight independent experts and 16 present or former officers and employees of Hollister and Abbott.

Moreover, it is undisputed that both parties, in arm's-length negotiations, agreed upon the arbitration clause. Hollister never alleges that it was deceived, nor was it deceived, into choosing arbitration as the forum for resolving its disputes with Abbott. Hollister agreed *ex ante* that arbitration would be used as an alternative means of resolving its disputes with Abbott, and must now *ex post* abide by its agreement. Therefore, Hollister's argument that the arbitrators exceeded their powers is without merit.

Accordingly, the decision of the circuit court confirming the arbitration award is affirmed.

Affirmed.

McNAMARA and FREEMAN, JJ., concur.