GLORIA HYATTE *et al.*, Plaintiffs-Appellants, v. EUGENE R. QUINN, Recorder of Deeds, Winnebago County, Defendant-Appellee.

Second District   Nos. 2—92—0413, 2—92—0444 cons.

Opinion filed January 21, 1993.—Rehearing denied February 16, 1993.

Michael K. Havrilesko, of Havrilesko & Associates, of Rockford (Ellen B. Lynch, of counsel), for appellant Gloria Hyatte.

Jacob Pomeranz, of Cornfield & Feldman, of Chicago (Richard J. Tupper, of counsel), for appellant American Federation of State, County and Municipal Employees.

Craig P. Thomas, of Reno, Zahm, Folgate, Lindberg & Powell, of Rockford (James D. Zeglis, of counsel), for appellee.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

Gloria Hyatte (employee), who was discharged from the office of the County of Winnebago recorder of deeds (employer), and the American Federation of State, County, and Municipal Employees, Local No. 473 (union), appeal from an order of the circuit court of Winnebago County which vacated on public policy grounds an arbitration award reinstating employee with back pay. On appeal, both employee and union claim that the arbitration award does not violate public policy; union argues that the trial court exceeded the scope of its review of the award; and employee alleges that employer's declaratory judgment suit brought to vacate the award was time-barred. Employer, as an alternative ground for upholding the trial court's judgment, claims that the arbitrator exceeded the scope

of her authority by deciding issues not presented to her for review. We reverse the judgment of the circuit court.

On August 4, 1986, employee was hired by employer as a microfilm technician where she filmed legal documents such as deeds and mortgages and edited the film for storage. According to Eugene Quinn, the recorder of deeds, the job of microfilm technician is a highly technical one which takes years to learn. According to both Quinn and Bob Stevenson, employee's immediate supervisor, employee's work deteriorated; she made too many mistakes, was absent excessively, and displayed a bad attitude. Employee was notified that she needed improvement on her use of time during her end-of-probation evaluation in November 1986. After 12 months on the job, she was told she needed to improve her use of time and her efficiency.

Employee was reprimanded by Stevenson on March 11, 1988, about her unsatisfactory work, bad attitude, tardiness and absenteeism. A similar reprimand was given employee in May 1988. On September 19, 1988, a meeting was held between Quinn, employee and her union representative wherein employee was chastised for making too many mistakes, smoking in the microfilm room where it was not permitted, and continuing to display an uncooperative and defiant attitude. Two days later employee was discharged.

Union grieved employee's discharge, and the case proceeded to arbitration pursuant to the collective bargaining agreement between union and employer. The arbitrator found that employee knew she was not to smoke in the microfilm area but did so anyway, and that she was never disciplined for smoking in that area, even though Stevenson had seen her smoking. The arbitrator also found that employee made approximately one to three mistakes for every 700 documents she filmed. Stevenson testified that no more than two mistakes was acceptable for every 2,500 documents filmed.

Stevenson also testified that employee was generally cooperative in correcting her mistakes and that she could still be trained to perform the job adequately. The arbitrator found that employee usually caught and corrected her own mistakes. Quinn testified that he discharged employee, in part, because he was concerned about damage to records, which could not be replaced. He admitted, however, that employee had never damaged any records.

Employee testified that she had health problems that contributed to her absenteeism and that she always called when she was going to be late or absent. Further, she claimed that she did not know that the complaints about her work were deemed so serious

that her discharge was considered. Finally, she alleged that the meeting held two days before she was fired was the first time her smoking and attitude were discussed.

The arbitrator found that employer should not have fired employee since employer had agreed in the collective bargaining agreement with the principles of corrective and progressive discipline. The arbitrator held, in a decision rendered on April 8, 1989, that employee's infractions were not serious enough to warrant discharge. Employee was reinstated with back pay and benefits.

On September 26, 1989, employer filed a declaratory judgment action asking the court to vacate the arbitration award. Union counterclaimed seeking to uphold the award. On December 18, 1989, employee filed an action to confirm the award. The two cases were consolidated, and the circuit court asked the parties to address the issue of whether the award violated public policy. The court subsequently held that reinstatement of employee violated the public policy embodied in the statute governing county recorders (Ill. Rev. Stat. 1991, ch. 34, par. 3—5001 et seq.), specifically, sections of that statute such as those requiring documents to be filed "in a complete and intelligible manner" (Ill. Rev. Stat. 1991, ch. 34, par. 3—5013), giving the recorder "the right to control the internal operations of his office" (Ill. Rev. Stat. 1991, ch. 34, par. 3—5005.2), and providing that the recorder "shall be guilty of malfeasance in office" if he fails to perform any of his statutory duties (Ill. Rev. Stat. 1991, ch. 34, par. 3—5031). Union and employee appealed.

■ We address first the statute of limitations question since a successful claim would obviate the need to reach the merits of the dispute. Employee argues that employer's declaratory judgment suit had to be brought within 90 days after employer received the arbitration decision. Employee cites the provision of the Illinois Public Labor Relations Act (Ill. Rev. Stat. 1991, ch. 48, par. 1608) stating, "The grievance and arbitration provisions of any collective bargaining agreement shall be subject to the Illinois 'Uniform Arbitration Act.'" Employee then cites the section of the Uniform Arbitration Act requiring applications to vacate arbitration awards to be brought within 90 days after delivery of the award, except in circumstances not relevant here. Ill. Rev. Stat. 1991, ch. 10, par. 112(b).

However, employee does not direct us to the later subpart of section 12 which states, "Nothing in this Section or any other Section of this Act shall apply to the vacating *** of any award entered as a result of an arbitration agreement which is a part of or

pursuant to a collective bargaining agreement." (Ill. Rev. Stat. 1991, ch. 10, par. 112(e).) We agree with *Board of Education of Meridian Community Unit School District 101 v. Meridian Education Association* (1983), 112 Ill. App. 3d 558, 561-62, which held that the plain language of section 12(e) overrides the jurisdictional time limits of section 12(b). The correct time limitation for vacating arbitration awards arising from collective bargaining agreements is the five-year period now contained in the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 13—205).

At oral argument, counsel for employee pointed to our decision in *City of De Kalb v. International Association of Fire Fighters, Local 1236* (1989), 182 Ill. App. 3d 367, as standing for the proposition that the language of section 12(e) speaks only to the grounds for vacating an award and does not vitiate the Uniform Arbitration Act's application to awards arising from collective bargaining agreements. We have examined the *De Kalb* case, and we disagree with counsel. We noted in *De Kalb* that we were considering only whether the arbitration award in question violated public policy. (*De Kalb*, 182 Ill. App. 3d at 372.) The proper time for bringing an action to vacate an arbitration award arising from a collective bargaining agreement was simply not at issue in *De Kalb*. Because employer's action was brought approximately six months after the arbitration award was rendered, it is timely.

We next consider whether the trial court correctly determined that the award violated public policy. We conclude that the trial court erred.

■■ ■ "[A] court's review of an arbitrator's award is extremely limited. [Citations.] Moreover, a court must construe an award, if possible, as valid." (*American Federation of State, County & Municipal Employees v. State of Illinois* (1988), 124 Ill. 2d 246, 254 (hereinafter *Blasingame*).) Generally, an arbitration award arising from a collective bargaining agreement must be enforced if the arbitrator has not exceeded his authority and the award draws its essence from the collective bargaining agreement. (*Blasingame*, 124 Ill. 2d at 254.) However, an arbitration award may be set aside if it violates public policy. (*Board of Trustees of Community College District No. 508 v. Cook County College Teachers Union, Local 1600* (1979), 74 Ill. 2d 412, 423-24.) The public policy of Illinois is to be found in its constitution, its statutes and its judicial decisions. (*O'Hara v. Ahlgren, Blumenfeld & Kempster* (1989), 127 Ill. 2d 333, 341.) Further, the public policy must be clearly defined and dominant, and should not be gleaned from " ' "general considerations of

supposed public interests." ' " (*Blasingame*, 124 Ill. 2d at 261, quoting *W.R. Grace & Co. v. Local Union 759* (1983), 461 U.S. 757, 766, 76 L. Ed. 2d 298, 307, 103 S. Ct. 2177, 2183, quoting *Muschany v. United States* (1945), 324 U.S. 49, 66, 89 L. Ed. 744, 756, 65 S. Ct. 442, 451.) Finally, "[i]n order to vacate the award of an arbitrator, the violation of public policy must be clearly shown." *Blasingame*, 124 Ill. 2d at 261.

No public policy exists requiring employee's discharge for the workplace sins she committed. The trial court, citing *United States Postal Service v. American Postal Workers Union* (1st Cir. 1984), 736 F.2d 822, held that public policy could be derived from common sense, in addition to constitutions, statutes and case law. It thereafter extracted its public policy prohibiting employee's reinstatement from the county recorder's statute and common sense. We read *Postal Service* differently.

In *Postal Service*, the United States Court of Appeals for the First Circuit held that it was a violation of public policy to order reinstatement of a postal worker who had been convicted a short time earlier of embezzling a large sum of money from the postal service. (736 F.2d at 825-26.) The court stated, "When a court bars the enforcement of an arbitration award on the basis of public policy, that policy must be clearly defined. [Citation.] The policies in this case are not only defined by positive law, but are also the clear dictates of common sense." 736 F.2d at 825.

It seems to us that the First Circuit was citing common sense as additional support for its conclusion, not stating that public policy could be derived from common sense. Further, the United States Supreme Court rejected the commonsense approach in *United Paperworkers International Union v. Misco, Inc.* (1987), 484 U.S. 29, 98 L. Ed. 2d 286, 108 S. Ct. 364. In *Misco*, the Court held that an arbitration award reinstating an employee who had been fired for violating his employer's drug policy should not have been vacated on public policy grounds. The Court of Appeals for the Fifth Circuit had affirmed the vacation of the award. The Supreme Court noted that the court of appeals had not reviewed the proper statutory and case law sources to find its public policy against operating dangerous machinery while under the influence of drugs. It held, "Although certainly such a judgment is firmly rooted in common sense, we explicitly held in *W.R. Grace* [*W.R. Grace & Co. v. Local Union 759* (1983), 461 U.S. 757, 76 L. Ed. 2d 298, 103 S. Ct. 2177] that a formulation of public policy based only on 'general considerations of supposed public interests' is not the sort that

permits a court to set aside an arbitration award that was entered in accordance with a valid collective-bargaining agreement." 484 U.S. at 44, 98 L. Ed. 2d at 303, 108 S. Ct. at 374.

Adding further support to our conclusion that public policy cannot arise from common sense is the trial court's statement that common sense "is not a clear, well-defined concept" but "differs from person to person." Our supreme court has said, " ' "The public policy of a State or nation must be determined by its constitution, laws and judicial decisions,—not by the varying opinions of laymen, lawyers or judges as to the demands of the interests of the public." ' " (*Blasingame*, 124 Ill. 2d at 260, quoting *Zeigler v. Illinois Trust & Savings Bank* (1910), 245 Ill. 180, 193, quoting *Hartford Fire Insurance Co. v. Chicago, Milwaukee & St. Paul Ry. Co.* (8th Cir. 1895), 70 F. 201, 202.) To derive public policy from common sense would violate the explicit teaching of *Blasingame*.

We find the case at bar to be controlled by *Blasingame*. In that case, two mental health technicians were fired for taking an unauthorized side trip away from their facility at a time when the facility was short-staffed. During the technicians' absence, a patient died in a wing not assigned to the technicians. They were discharged for conduct constituting mistreatment of a service recipient. The arbitrator reduced the technicians' discharges to suspensions, finding that there was not just cause for the discharges in view of mitigating factors such as the technicians' exemplary employment histories and the unlikelihood of a similar event ever occurring. The trial court determined that the arbitration award violated public policy, but the appellate court reversed. The supreme court affirmed the appellate court, noting the interplay between the public policy favoring compassionate care of the mentally disabled, the public policy promoting good relations between public employers and public employees, and the public policy requiring finality in arbitration awards. *Blasingame*, 124 Ill. 2d at 262.

The *Blasingame* court reasoned, "There is simply no policy that mandates the discharge of all employees found guilty of mistreatment of a service recipient when the arbitrator expressly finds that the grievants were exemplary mental health employees, when punishment has been imposed, and where no nexis [*sic*] exists between the infraction and the patient's tragic death." (124 Ill. 2d at 263.) Likewise, no clearly defined and dominant public policy requires employee's discharge in this case.

The statutes cited by the trial court giving the county recorder the right to control his office (Ill. Rev. Stat. 1991, ch. 34, par. 3—

5005.2), requiring him to file complete and intelligible documents (Ill. Rev. Stat. 1991, ch. 34, par. 3—5013), and providing penalties for his failure to do so (Ill. Rev. Stat. 1991, ch. 34, par. 3—5031) do not sufficiently show the type of dominant public policy required to overturn the arbitration award. For example, the court in *Blasingame* noted that an Illinois statute required recipients of mental health services to be provided with adequate and humane care (Ill. Rev. Stat. 1991, ch. 91½, par. 2—102(a)) and that another statute made criminal the abuse or gross neglect of long-term care facility residents (Ill. Rev. Stat. 1991, ch. 38, par. 12—19). The *Blasingame* court, however, cautioned that the public policy to be gleaned from the two statutes, the policy favoring proper treatment of the mentally disabled, should not be stretched to require the discharge of the two mental health technicians under the circumstances. *Blasingame*, 124 Ill. 2d at 262-63.

Similarly, the general public policies in favor of intelligible public records and efficient operation of the recorder's office embodied in the county recorder's statute do not require the firing of employee for the relatively minor infractions alleged here. Eugene Quinn, the county recorder, testified at the arbitration hearing that employee had not damaged any records. Moreover, while employee's work record was not spotless, as were the work records of the two employees in *Blasingame*, employee's supervisor testified that employee was generally cooperative in correcting her mistakes and that she could still be trained to perform her duties correctly.

Other cases support our conclusion. For example, in *Department of Central Management Services v. American Federation of State, County & Municipal Employees* (1991), 222 Ill. App. 3d 678, it was held that reinstatement of a parole officer who had been fired for making false statements to a Federal agency in violation of the penal laws did not offend public policy. (222 Ill. App. 3d at 686-89.) The court there rejected contentions that reinstatement would violate the public policy of ensuring the integrity of the correctional system and would send a message to other parole officers that they need not obey the law to keep their jobs. (222 Ill. App. 3d at 687.) The court noted, "[T]here is no well-defined or dominant policy mandating discharge of this parole officer because of the felony which he committed." 222 Ill. App. 3d at 688.

Another case, also entitled *Department of Central Management Services v. American Federation of State, County & Municipal Employees* (1990), 197 Ill. App. 3d 503, is also instructive. In that case, the court considered whether arbitrators' reinstatement of

several public employees violated public policy. It determined that public policy did not permit reinstatement of a correctional officer who had been discharged for, *inter alia*, using illegal drugs with an ex-inmate in violation of regulations prohibiting socializing with such persons. (197 Ill. App. 3d at 514-15.) The court similarly held that reinstating correctional officers who had battered a prisoner violated public policy. (197 Ill. App. 3d at 514.) However, the court decided that it could not overturn on public policy grounds an arbitration award setting aside the discharge of two correctional officers who did not report the beating by the other two guards. The court stated, "[T]he mere violation of regulations requiring the reporting of misconduct by other employees, however serious, has an insufficient nexus to any public policy expressed in the constitution, laws, or court decisions to require employers to have a right to discharge for said conduct." (197 Ill. App. 3d at 515.) Moreover, the court noted that it could not find any support in the constitution, statutes or case law for a decision that public policy would be violated by reinstating a correctional officer who was likely to be unreliable and who failed to file certain reports. 197 Ill. App. 3d at 514-15.

█ Certainly the misconduct of employee here is much closer to that of the guards who did not report other officers' misconduct than it is to that of the guards who battered the prisoner and used drugs with an ex-inmate. We do not mean to imply that a public employer must continue to employ a worker who does substandard work. We are merely mindful of the extreme narrowness of the public policy exception to the arbitration finality rule. (*Department of Central Management Services v. American Federation of State, County & Municipal Employees* (1990), 197 Ill. App. 3d 503, 512; *Blasingame*, 124 Ill. 2d at 254.) Affirming the trial court's public policy decision would improperly broaden the public policy exception to the arbitration finality rule in violation of the mandates of the Illinois and United States Supreme Courts. Reinstatement of employee does not violate a dominant and clearly defined public policy.

█ The trial court also determined that the arbitrator improperly decided a public policy question when she "modified" the collective bargaining agreement to provide for mandatory progressive discipline. Section 8.1 of the collective bargaining agreement states, "While the parties agree with the tenets of progressive and corrective discipline, disciplinary action may include [oral reprimand, written reprimand, suspension and discharge], but shall be initiated in light of the seriousness of the offense." The trial court held that by

striking employee's discharge, the arbitrator rewrote the collective bargaining agreement to provide that discipline *shall* be progressive instead of *may* be progressive. We disagree with the trial court and find that *Blasingame* controls this issue as well.

In *Blasingame,* as in the present case, the issue before the arbitrator involved the propriety of employee discharges. Also in *Blasingame,* as in this case, the employer contractually agreed with the tenets of progressive and corrective discipline. The *Blasingame* court clarified that, in a discipline case, an arbitrator may carefully scrutinize penalties imposed to determine whether the "punishment fits the crime." (124 Ill. 2d at 256-57.) This power of the arbitrator is especially relevant in our case since the collective bargaining agreement provides that disciplinary action "*shall* be initiated in light of the seriousness of the offense." (Emphasis added.) Clearly then, the arbitrator had the authority under the collective bargaining agreement to weigh the seriousness of employee's work misconduct against the nature of the penalty.

Further, the arbitrator's decision on progressive discipline does not usurp the recorder's statutory right to control the internal operations of his office. (Ill. Rev. Stat. 1991, ch. 34, par. 3—5005.2.) Again, *Blasingame* is instructive. The employer in *Blasingame* contended that the arbitrator's decision reinstating the employees was an improper substitution of the arbitrator's own judgment for the employer's contractually granted discretion as to the discipline necessary to promote acceptable levels of patient care. The supreme court rejected this argument and cautioned that the arbitrator's decision as to whether the penalty fits the misconduct should not be confused with encroachment on an employer's right to define quality of service. (*Blasingame,* 124 Ill. 2d at 256-57.) Employer here is not prohibited from disciplining employee, from controlling his office, or from complying with his duty to maintain accurate records, but is merely contractually bound to impose punishment consistent with employee misconduct.

Next, union claims that the trial judge erroneously substituted his own view of the facts and interpretation of the contract for that of the arbitrator. We agree.

The United States Supreme Court has set forth the proper standard for reviewing arbitration awards:

> "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not

sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. *** [T]he arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." (*United Paperworkers International Union v. Misco, Inc.* (1987), 484 U.S. 29, 37-38, 98 L. Ed. 2d 286, 299, 108 S. Ct. 364, 370-71.)

Thus, a court cannot substitute its findings for those of the arbitrator and cannot overturn an arbitration award merely because it disagrees with the arbitrator. See also *Blasingame*, 124 Ill. 2d at 255.

■ In this case, the arbitrator explicitly found that employee's misconduct "never resulted in any serious operational problems that would preclude the use of progressive discipline." In contrast, the trial court found that employee's "violations, as shown by the evidence presented, [were] sufficiently clear to warrant judicial interference with the arbitrator's award." Further, the trial court found that the evidence was "contained in the record, pleadings, affidavits, and motion to supplement evidentiary record, along with the arbitrator's findings and decision."

The trial court's review went beyond the extremely narrow review mandated by both the Illinois and United States Supreme Courts. The trial court looked at the evidence anew, instead of confining its focus to the facts as found by the arbitrator. The job of the trial court was to determine whether the arbitrator's reinstatement decision violated public policy, not whether the facts of the case warranted discharge. (See *Misco*, 484 U.S. at 43, 98 L. Ed. 2d at 302, 108 S. Ct. at 373.) The trial court erred in broadening the scope of its review of the arbitrator's decision.

Finally, employer claims, as an alternative method of upholding the trial court's decision, that the arbitrator exceeded her authority in deciding whether employee was fired for just cause, when the just cause issue was not presented to her in the grievance. Additionally, employer alleges that the issue of whether employee's misconduct created serious operational problems was not presented to the arbitrator and that she thus had no authority to decide that is-

sue. We disagree with employer's interpretation of the arbitration award.

When an arbitrator decides issues not submitted to him by the parties, he exceeds his authority. (*Board of Trustees of Community College District No. 508 v. Cook County College Teachers Union, Local 1600* (1979), 74 Ill. 2d 412, 419; *Blasingame*, 124 Ill. 2d at 254.) Moreover, the collective bargaining agreement itself limits the arbitrator's authority to resolving issues submitted or raised by the parties.

■ After reading the arbitrator's decision, we conclude that the "just cause" issue was not the basis of her decision, notwithstanding that she framed the question for decision as whether just cause existed to discharge employee. The arbitrator's decision hinged on the progressive discipline issue, which was expressly submitted for decision and which is of necessity intertwined with an examination of just cause for discharge. The entire thrust of the arbitrator's written decision is that discharge was too severe a sanction for employee's misconduct and that progressive discipline should have been utilized. Further, deciding whether employee's substandard conduct caused serious problems for the recorder's office was necessary to resolve the progressive discipline question. As we have previously noted, the arbitrator may closely scrutinize employment discipline to ensure that the "punishment fits the crime." (*Blasingame*, 124 Ill. 2d at 256-57.) Under the circumstances of this case, the just cause and "serious operational problems" issues were sufficiently intertwined with the progressive discipline question that any examination of the progressive discipline issue unavoidably entailed just cause and "serious operational problems" considerations. The arbitrator did not exceed the scope of her authority.

For the foregoing reasons, we reverse the judgment of the circuit court of Winnebago County.

Reversed.

McLAREN and BOWMAN, JJ., concur.