**AMERICAN HOME ASSURANCE COMPANY, Plaintiff–Appellee,**

v.

**Steven STONE, Sheila Hall, Peter Hall, Brandon Hall, and Devin Hall, Defendants–Appellants.**

No. 94–3388.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 14, 1995.

Decided Aug. 4, 1995.

As Modified August 24, 1995.

John T. Wardrope, Robert A. Chaney (argued), Purcell & Wardrope, Chicago, IL, for plaintiff-appellee.

Henry Burt, Tracy D. Kasson, Rathje, Woodward, Dyer & Burt, Wheaton, IL, George P. Lindner (argued), John R. Felton, William A. Delaney, II, Lindner, Speers & Reuland, Aurora, IL, for defendants-appellants.

Before WOOD, Jr., COFFEY, and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

In 1990, Sheila and Peter Hall received marriage and family counselling from Steven H. Stone, a psychotherapist, for a period of four months. Sheila and Peter Hall and their children later brought three separate malpractice lawsuits in Illinois state court against Stone, alleging that Stone engaged in a sexual relationship with Sheila while she was receiving professional treatment and therapy. Stone's insurer, American Home Assurance Company (American Home), brought this diversity action seeking a declaration of policy limit. The insurance company argues that a special provision in the professional insurance policy limiting American Home's obligation to indemnify Stone to $25,000 for malpractice lawsuits involving allegations of sexual misconduct is applicable to the lawsuits filed by the Halls against Stone. The district court agreed, and granted summary judgment in favor of American Home. The Halls appeal. We affirm.

## I.  Background

Stone was a social worker licensed by the State of Illinois. He was employed as a psychotherapist[1] and insured by American Home under its Mental Health Counselor's Professional Liability Policy. In June 1990,

Sheila and Peter Hall began seeing Stone for marriage counseling. Their children, Devin and Brandon Hall, also participated in several family counseling sessions with Stone. After several weekly joint sessions, Stone commenced individual therapy sessions with Sheila Hall, the wife and mother, in July 1990. The Halls separated in October 1990, and the wife continued individual therapy sessions. In October 1990, Stone began having sexual contact and later sexual intercourse with Sheila, and their relationship continued until December of 1991. At the time Sheila Hall terminated her relationship with Stone, she also reported Stone to the Illinois Department of Professional Regulation (IDPR). IDPR conducted an investigation and discovered allegations of Stone's other patients having had sexual intercourse with him. Stone voluntarily relinquished his social worker's license in June 1992.

The husband and wife filed separate lawsuits against Stone on March 18 and June 9, 1992, respectively, in the Circuit Court of DuPage County, alleging malpractice and intentional or negligent infliction of emotional harm. Specifically, Sheila Hall alleged that:

In the course of treatment and therapy, Stone so aroused Plaintiff's emotions by the manipulation of the transference phenomenon that she fell in love with him. Stone brought about this result by wrongfully and negligently manipulating the psychotherapeutic situation to the point where plaintiff's feelings were no longer transferred feeling for him as a psychotherapist, but direct feelings of love for him as a person, beyond the phenomenon of transference. As a result of this manipulation of the transference phenomenon, Plaintiff began a sexual relationship with Stone....

1. Under the Illinois Sexual Exploitation in Psychotherapy Act, 740 ILCS 140/1(d), a "psychotherapist" is defined as a "physician, psychologist, nurse, chemical dependency counselor, social worker, or other person, whether or not licensed by the State, who performs or purports to perform psychotherapy." "Psychotherapy" is in turn defined as "the professional treatment, assessment, or counseling of a mental or emotional illness, symptom, or condition." 740 ILCS 140/1(e). Stone was a "licensed social worker," defined under the Illinois Clinical Social Work and Social Work Practice Act as a person who holds a license authorizing the practice of social work, including the "provi[sion] of mental health services ... based on knowledge and theory of psychosocial development, behavior, psychopathology, unconscious motivation, interpersonal relationships, and environmental stress." 225 ILCS 20/3. Stone was, therefore, considered a psychotherapist as defined by the Illinois statutes.

As a result of the control Stone exercised over the Plaintiff, he failed to employ counseling techniques commonly used which would have improved marital relationship between Plaintiff and her husband....

That as a direct and proximate cause of Stone's sexual contact with the Plaintiff ... Plaintiff has experienced extreme pain and suffering, as well as emotional distress of a continuing and permanent nature, including an attempted suicide ...

Also focusing on the sexual relationship between Sheila Hall and Stone, Peter Hall alleged in his separately filed complaint:

That during the aforedescribed counseling of this plaintiff, and the counseling of Plaintiff's wife, this defendant, contrary to his fiduciary obligations to this plaintiff, engaged in a course of sexual conduct with Plaintiff's wife when Defendant Stone knew, or reasonably should have known, that said conduct would make it impossible to dissolve [sic] the aforereferenced marital discord ... and would cause severe emotional distress to Plaintiff, Peter Hall....

Additionally, the Halls' children, Devin and Brandon Hall, alleged in a separate action that Stone negligently caused them emotional harm and distress by engaging in a sexual relationship with their mother and causing their parents' marriage to be irretrievably damaged. The negligent acts or omissions allegedly committed by Stone include failing to "employ counseling techniques ... that would have improved the marital relationship between Peter Hall and Sheila Hall and the Hall family relationship," mishandling "the transference phenomenon and allow[ing] sexual intercourse to occur between Stone and Sheila Hall during the course of the marital and family counseling."

During the period of his counseling sessions with the Halls, Stone was insured under American Home's Mental Health Counselor's Professional Liability policy. The limits of liability under the policy are $1 million for "each wrongful act or series of continuous, repeated or interrelated wrongful acts or occurrence," and $3 million in the aggregate. However, a lower limit of liability applies when the lawsuits filed against the insured contain allegations of sexual misconduct. The "Sexual Misconduct" provision limits American Home's total liability to $25,000 for "all claims against any Insured(s) involving any actual or alleged erotic physical contact, or attempt thereat [sic] or proposal thereof" by the insured with his or her former or current patient. The provision further provides that the $25,000 aggregate limit applies to cover "any and all causes of action alleged and arising out of the same related courses of professional treatment and/or relationships" if sexual misconduct is "alleged at any time either in a complaint, during discovery, at trial or otherwise." It is undisputed that the costs incurred in defending sexual misconduct suits are not subject to the $25,000 limit, but are subject to the $1 million limit reduced by $25,000. That is, American Home's total obligation in defending the three lawsuits filed by the Halls is not to exceed $975,000.

American Home filed this action in the district court seeking a declaration that the $25,000 limit was applicable to its potential obligation to indemnify Stone in the three lawsuits filed by the Halls. In its motion for summary judgment, American Home argued that the special provision was triggered because the underlying malpractice suits charged sexual misconduct on the part of the insured. In response, the Halls filed cross-motions for summary judgment claiming, among other things, that the "Sexual Misconduct" provision in American Home's insurance policy violated Illinois public policy. The court found in favor of American Home and ruled that the "Sexual Misconduct" provision was applicable to limit American Home's liability with respect to the Halls' three lawsuits.

## II. Analysis

■ We review a grant of summary judgment *de novo, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), viewing the record and the inferences drawn from it in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

We will affirm if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Because the parties did not raise a conflict of law issue in this diversity suit and argued only Illinois law in their submissions to the trial court, we see no reason to discuss the issue of choice of law and thus, will apply Illinois law. *See Employers Ins. of Wausau v. Bodi–Wachs Aviation Ins. Agency, Inc.,* 39 F.3d 138, 142 n. 2 (7th Cir.1994); *In re Stoecker,* 5 F.3d 1022, 1028–29 (7th Cir.1993); *see also Peerman v. Georgia–Pacific Corp.,* 35 F.3d 284, 286 (7th Cir.1994).

■ The issue before us is whether the enforcement of the "Sexual Misconduct" provision, which limits American Home's total liability to $25,000 for all claims raised in the Halls' three underlying malpractice lawsuits, will violate the Illinois public policy of protecting mental health patients from sexual exploitation by psychotherapists. The relevant portions of American Home's insurance policy provide:

### SPECIAL PROVISIONS

1. *Sexual Misconduct*—The total limit of the Company's liability here-under shall not exceed $25,000 in the aggregate for all damages with respect to the total of all claims against any Insured(s) involving any actual or alleged erotic physical contact, or attempt thereat [sic] or proposal thereof:
a) by any Insured ...
b) with or to any former or current patient or client of any Insured, or with or to any relative of or members of the same household as any said patient or client ...
In the event any of the foregoing are alleged at any time, either in a complaint, during discovery, at trial or otherwise, any and all causes of action alleged and arising out of the same or related courses of professional treatment and/or relationships shall be subject to the aforesaid $25,000 aggregate limit of liability and to all other provisions of this clause....

The Halls argue that the "Sexual Misconduct" provision is void as against Illinois

public policy because victims of sexual exploitation by psychotherapists would practically go uncompensated if the $25,000 limit applies. According to the Halls, it is the public policy of Illinois to protect its citizens from psychotherapists' sexual exploitation and to ensure that victims of sexual misconduct are fully compensated. Thus, the Halls' argument continues, allowing insurers to limit their liability for malpractice lawsuits involving psychotherapists' sexual misconduct would be contrary to this Illinois public policy.

■ The premise of the Halls' argument is that Illinois courts will not enforce a private agreement which is contrary to public policy. *See O'Hara v. Ahlgren, Blumenfeld and Kempster,* 127 Ill.2d 333, 130 Ill.Dec. 401, 405, 537 N.E.2d 730, 734 (1989); *Board of Trustees v. Cook County College Teachers Union,* 74 Ill.2d 412, 24 Ill.Dec. 843, 386 N.E.2d 47 (1979); *Zeigler v. Illinois Trust & Savings Bank,* 245 Ill. 180, 91 N.E. 1041, 1046 (1910) ("The laws and the public policy of [Illinois] permit and require the utmost freedom of contracting between competent parties, and it is only when a contract expressly contravenes the law or the known public policy of the state that courts will hold it void."); *Kaplan v. Pavalon & Gifford,* 12 F.3d 87, 89 (7th Cir.1993). *See also McClure Engineering Associates, Inc. v. Reuben H. Donnelley Corp.,* 95 Ill.2d 68, 69 Ill.Dec. 183, 185–86, 447 N.E.2d 400, 402–03 (1983) (stating that in areas not regulated by the state, there is "a widespread policy of permitting competent parties to contractually allocate business risks as they see fit."). The Illinois Supreme Court has defined "public policy" as "a legal principle which holds that no one may lawfully do that which has a tendency to injure the public welfare." *O'Hara,* 130 Ill. Dec. at 405, 537 N.E.2d at 734; *see also McClure Engineering Associates,* 69 Ill.Dec. at 185, 447 N.E.2d at 402. The public policy of Illinois must be determined "not by the varying opinions of laymen, lawyers, or judges as to the demands of the interest of the public," but rather, by its constitution and statutes, and, when cases arise concerning a matter upon which they are silent, by its "judicial decisions and the constant prac-

tice of the government officials." *Zeigler*, 91 N.E. at 1046; *see also O'Hara*, 130 Ill.Dec. at 405, 537 N.E.2d at 734; *State Farm Mut. Auto. Ins. Co. v. Collins*, 258 Ill.App.3d 1, 196 Ill.Dec. 217, 218, 629 N.E.2d 762, 763 (1994). The policy must be "well defined and dominant" and may not be gleaned from "general consideration of supposed public interests." *See American Federation of State, County and Municipal Employees, AFL–CIO v. State of Illinois*, 124 Ill.2d 246, 124 Ill.Dec. 553, 559, 529 N.E.2d 534, 540 (1988) (quoting *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183–84, 76 L.Ed.2d 298 (1983)). Moreover, under Illinois law, whether or not a contract is contrary to public policy "depends on the peculiar facts and circumstances of each case." *O'Hara*, 130 Ill.Dec. at 405, 537 N.E.2d at 734; *Board of Trustees*, 24 Ill.Dec. 843, 386 N.E.2d 47. In deciding whether a contract violates public policy, the Illinois courts also consider "whether the agreement is so capable of producing harm that its enforcement would be contrary to the public interest." *O'Hara*, 130 Ill.Dec. at 405, 537 N.E.2d at 734.

In the case at bar, the Halls have not cited any Illinois statutes or judicial decisions, nor do we know of any, that would support the claim that there is a clearly defined public policy in Illinois prohibiting insurers of psychotherapists from limiting their liability in malpractice suits involving alleged psychotherapists' sexual misconduct. There is no doubt that Illinois, like all states, has a policy of protecting psychotherapy patients from sexual exploitation by the therapists. Illinois courts have made it clear that a psychotherapist who engages in a sexual relationship with his or her patient is guilty of malpractice. *See, e.g., Corgan v. Muehling*, 143 Ill.2d 296, 158 Ill.Dec. 489, 574 N.E.2d 602 (1991); *Horak v. Biris*, 130 Ill.App.3d 140, 85 Ill.Dec. 599, 474 N.E.2d 13 (1985). Particularly, the Illinois Sexual Exploitation in Psychotherapy Act, 740 ILCS 140/1, *et seq.*, effective January 1, 1989, provides patient-victims with a statutory cause of action against

the therapists and allows the victims to "recover damages from a psychotherapist who is found liable for sexual exploitation." [2] *See* 740 ILCS 140/2.

However, simply because Illinois has an interest in protecting the public from, and possibly compensating the victims of, sexual exploitation by psychotherapists, it does not necessarily follow that such a public policy would serve to preclude insurers from limiting their coverage for liability arising out of the insured's sexual misconduct. Most importantly, Illinois does not require psychotherapists to obtain malpractice insurance. That is, victims of sexual exploitation by uninsured psychotherapists presumably would be compensated solely by the psychotherapists without any guarantee that the therapists would be financially capable of paying the damages, much less the assurance that recovery would be in excess of $25,000, the amount provided by American Home's insurance policy. Were the Illinois legislature to consider greater compensation (or recovery over and above the amount set forth in American Home's insurance policy) by victims of psychotherapists' sexual exploitation to be of over-riding state interest, we are confident that the Illinois legislature would have mandated liability insurance and required insurers to provide more coverage than that offered by American Home. Yet, the Sexual Exploitation in Psychotherapy Act, 740 ILCS 140/1, *et seq.*, the seminal legislation that seeks to protect psychotherapy patients from sexual exploitation by the therapists, contains no such requirement. It merely provides that victims "may recover damages from a psychotherapist who is found liable for sexual exploitation." 740 ILCS 140/2(b).

Similarly, the comprehensive licensing scheme of the Illinois Clinical Social Work and Social Work Practice Act, 225 ILCS 20/1, *et seq.*, under which Stone was licensed, contains no requirement that social workers acquire insurance to protect the public from their malpractice, even though the Act ex-

---

**2.** Under the Act, a victim has a cause of action against the psychotherapist even if the sexual contact occurred after the period the patient received treatment from the therapist, so long as the former patient could establish that he or she was emotionally dependent on the psychotherapist at the time of the sexual contact. *See* 740 ILCS 140/2.

pressly provides that its purpose "is to protect and to benefit the public," and specifically recognizes that social workers' practice "affects the public health, safety and welfare."[3] Likewise, rules promulgated by the Illinois Department of Professional Regulation are silent on the subject of insurance. *See* Ill.Admin.Code title 68, ch. 7, ¶ 1470.5, *et seq.*

A reasonable inference from the Illinois legislature's decision not to mandate liability insurance is that the Illinois legislature deems *potential* recovery from a defendant psychotherapist sufficient to fulfill the public's interest in compensating the victims. By implication, when a psychotherapist does choose to have liability insurance (thus allowing the victim to have an even greater chance of obtaining some compensation), we refuse to hold that a cap on the insurer's liability would disserve the public interest. On the contrary, there is evidence suggesting that the Illinois Legislature would consider this type of insurance policy to be in conformity with the public policy of Illinois. In the recently enacted Civil Justice Reform Amendments of 1995, Ill.Legis.Serv. No. 1, Public Act 89–7 (West 1995), effective March 9, 1995, the Illinois legislature declared that while it is the public policy of Illinois that "persons injured through the negligence or deliberate misconduct of another be afforded a legal mechanism to seek compensation for their injuries," it is also the public policy of the state to "protect the availability of affordable liability insurance," and to "decrease the systemic costs of tort recovery." In enacting the reform amendments, the Illinois legislature further stated that it is the public policy of Illinois to "reject tort theorists who would use tort doctrine as a system of socialized compensation insurance." *Id.* Indeed, to achieve that end, the Illinois legislature placed caps on recovery of punitive damages in cases other than healing art or legal malpractice cases, and limited recovery of non-

economic damages in all tort actions to $500,-000 per plaintiff. *See* P.A. 98–7 §§ 2–1115.05; 2–1115.1. What can be drawn from the Illinois legislative reform is that the Illinois legislature is attempting to strike a proper balance between allowing tort victims to seek compensation and prohibiting the highly erratic tort awards from "undercut[ting] the deterrence function of tort law." *Id.* It is an effort to prevent the systemic costs of tort liability from continuing to "threaten the economic health of the State [of Illinois] through higher consumer prices, increased taxes, and ever-rising health care costs." *Id.* American Home's Professional Liability insurance policy, under which Stone was insured, was issued for a premium charge of $209.00 per year. The "Sexual Misconduct" provision can be considered a legitimate effort by American Home to offer a reasonably priced insurance policy and at the same time limit its exposure to a substantial hazard or risk of loss. This is true especially in light of the potentially large jury verdicts that often result from suits involving the emotionally charged subject of sexual exploitation by a psychotherapist. In fact, American Home's intent to provide limited indemnity for lawsuits containing such allegations, in exchange for a relatively affordable premium, is clearly expressed in the insurance contract entered into by Stone. For the vast majority of mental health professionals who never engage in sexual exploitation of their patients, this kind of insurance policy fills an important gap in the marketplace. Voiding the "Sexual Misconduct" provision may produce the unintended result of requiring the well-behaving majority to subsidize the misconduct of a few, and increasing health care cost.

■ Furthermore, we note that the victim-patient is not prevented from suing the tortfeasor therapist for an amount over and

---

**3.** § 1 of the Act provides:

Declaration of public policy. The purpose of this Act is to protect and to benefit the public by setting standards of qualifications, education, training and experience for those who seek to engage in the independent practice of clinical social work and in the practice of social work and to promote high standards of

professional performance for those engaged in the independent practice of clinical social work and in the practice of social work in the State of Illinois. Such practice is hereby declared to affect the public health, safety and welfare and should be subject to regulation in the public interest.
225 ILCS 20/1.

above that provided by the therapist's insurance policy; or in this case, should Stone's insurance coverage be insufficient to adequately compensate the Halls for their damages, the Halls could and should consider holding Stone accountable for the deficiency. That is, under the Illinois statutory scheme, any question as to the appropriate coverage of a psychotherapist's liability insurance can, at best, be a tangential issue to the broader-policy concern of protecting the public from sexual exploitation by psychotherapists. Absent a more definitive pronouncement by the Illinois legislature, we refuse to hold that an insurer's limitation of coverage in suits involving sexual misconduct violates the Illinois public policy of allowing victims to recover damages from psychotherapists. *Cf. Safeco Ins. Co. v. Seck,* 225 Ill.App.3d 397, 167 Ill. Dec. 636, 587 N.E.2d 1251 (1992) (refusing to hold that automobile insurance provisions excluding recovery by family members is void as against the public policy espoused by Illinois Women's Rights Act, which abrogated interspousal tort immunity, because the Act speaks to legal empowerment rather than guaranteed insurance coverage); *Collins,* 196 Ill.Dec. 217, 629 N.E.2d 762 (following *Safeco* ). The policy questions of whether a psychotherapist should obtain malpractice liability insurance, and how much coverage, are within the province of the Illinois legislature. We will not expand a mutually binding private insurance contract on public policy grounds simply because the expansion might be more desirable or advantageous to a third party beneficiary of the insurance contract. No matter how sympathetic we might be with the Halls' positions as victims of Stone's alleged misconduct, the Halls' public policy argument is nothing more than an attempt to rewrite a private agreement which the tortfeasor, Stone, had entered into with his insurer, American Home. *Cf. Senn v. United Dominion Indust., Inc.,* 951 F.2d 806, 818 (7th Cir.1992) ("we are not permitted to allow our sympathies and desires to vitiate clear principles of contract [law]" by amending the clear terms of the health and welfare benefits contained in a collective bargaining agreement), *cert. denied,* —— U.S. ——, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993); *Heller v. Equitable Life Assur. Soc.,* 833 F.2d 1253, 1257 (7th Cir.1987) ("In the absence of a clear, unequivocal and specific contractual requirement [placing a duty on a party,] we refuse to order the same. To hold otherwise and to impose such a requirement would, in effect, enlarge the terms of the [insurance] policy beyond those clearly defined in the policy agreed to by the parties.").

Moreover; the limitation of liability provision at issue is unlike those limitation of coverage provisions that Illinois has declared void as against public policy. For example, the Illinois Supreme Court has struck down insurance policy provisions that seek to limit the uninsured motorist coverage required by the Illinois uninsured motorists statute, 215 ILCS 5/143a. *See, e.g., Squire v. Economy Fire & Casualty Co.,* 69 Ill.2d 167, 13 Ill.Dec. 17, 370 N.E.2d 1044 (1977) (holding that provision in an automobile insurance policy, which made the uninsured motorist coverage dependent on the insured not riding in a second family automobile, violated the Illinois public policy of providing minimum uninsured motorist coverage); *Barnes v. Powell,* 49 Ill.2d 449, 275 N.E.2d 377 (1971) (holding that provision limiting uninsured motorist coverage to injuries arising out of "uninsured automobiles" contravenes the public policy expressed in the uninsured motorist statute because the public policy is to protect policyholders in general against injuries caused by uninsured motorists, whether or not the vehicle in which the uninsured motorist is riding is insured); *see also Illinois Emasco Ins. Co. v. Doran,* 160 Ill.App.3d 927, 112 Ill.Dec. 361, 513 N.E.2d 970 (1987). *Cf. Menke v. Country Mut. Ins. Co.,* 78 Ill.2d 420, 36 Ill.Dec. 698, 401 N.E.2d 539 (1980) (provision prohibiting the "stacking" of insurance policies does not contravene the public policy expressed in the uninsured motorist statute because application of the anti-stacking clause would still allow the insured to recover at least the amount set forth in Illinois financial responsibility law). These provisions were declared void because the Illinois uninsured motorists statute expressly mandates that insurance companies must provide uninsured motorists coverage in connection with any automobile liability policy, and the clearly expressed public policy of the statute is "to assure that compensation [in the amount equal to the

minimum insurance coverage required by law] will be available to policyholders, in the event of injury by an uninsured motorist." *See Barnes,* 275 N.E.2d at 379 (quoting *Putnam v. New Amsterdam Casualty Co.,* 48 Ill.2d 71, 269 N.E.2d 97, 106 (1970)); *see also Menke,* 36 Ill.Dec. at 701, 401 N.E.2d at 542.

Unlike the uninsured motorist cases, the present case involves no such clear and express policy on the part of the state of Illinois ensuring compensation of the victims, much less any mandate by the Illinois legislature requiring insurance companies to further that public interest. As stated earlier, the Illinois legislature does not mandate liability insurance for psychotherapists' malpractice. Nor does it require insurance companies to provide a minimum coverage, as it did in uninsured motorist statutes, to ensure that victims of psychotherapists' sexual misconduct would be compensated. While compensating victims of sexual exploitation may be in the public interest, there is simply nothing in the language of the Illinois Sexual Exploitation in Psychotherapy Act to indicate that the drafters intended to impose an affirmative duty on malpractice insurers to further this interest. Nothing supports the claim that an insurer's limitation on its liability for malpractice arising out of the insured's sexual misconduct contravenes Illinois public policy. The Illinois legislature, being duly elected, is charged with the responsibility of determining what legislation best serves the public's interest. When enacting the Sexual Exploitation in Psychotherapy Act, the Illinois legislature presumably had heard arguments from all sides and was in the best position to mandate such liability insurance as that advocated by the Halls. Yet, it chose not to do so. Our duty as a reviewing court in this diversity suit is not to legislate but only to interpret the laws as enacted by the Illinois legislature. Consequently, we hold that the "Sexual Misconduct" provision in American Home's malpractice liability insurance policy limiting the insurer's liability to $25,000 in lawsuits involving the insured's sexual misconduct is not void as against Illinois public policy.

Our conclusion is bolstered by the fact that the insurance policy at issue was approved by the Illinois Department of Insurance. Under the Illinois Insurance Code, the Director of Insurance has the responsibility to disapprove any insurance policy provision that he or she determines to be "misrepresentative, unjust, unfair, inequitable, ambiguous, misleading, inconsistent, deceptive, contrary to law or public policy of [Illinois], or contains exceptions or conditions which unreasonably or deceptively affect the risk purported to be assumed in the general coverage of the policy." *See* 215 ILCS 5/143. As the Illinois Supreme Court makes clear in *Kirk v. Financial Security Life Ins. Co.,* 75 Ill.2d 367, 27 Ill.Dec. 332, 336, 389 N.E.2d 144, 148 (1978), approval of an insurance policy provision by the Illinois Department of Insurance, though not conclusive upon Illinois courts, is "entitled to great weight as against contention that such a provision is against public policy." Because the "Sexual Misconduct" provision was found by the Director of Insurance to be in compliance with Illinois law and public policy, we are of the opinion that Illinois courts are likely to uphold the provision against challenges on public policy grounds.

Having determined that there is no known public policy in Illinois that would prohibit insurers from limiting coverage in malpractice actions involving the insured psychotherapist's sexual misconduct, we dismiss the Halls' arguments as to what they believe are the demands of the interest of the public. *See O'Hara,* 130 Ill.Dec. at 405, 537 N.E.2d at 734; *Zeigler,* 91 N.E. at 1046. The Halls assert that enforcement of the "Sexual Misconduct" provision would discourage victims from reporting sexual misconduct because under the provision, any allegation of sexual misconduct, whether or not accompanied by allegations unrelated to the alleged sexual misconduct, would trigger the $25,000 limit for the entire suit. Additionally, the Halls claim that application of the provision would have a disparate impact on women because women are more likely to be victims of sexual exploitation by psychotherapists.

■ As an initial matter, "when this court sits in diversity, federalism requires us to

enforce the substantive law of the forum state, even when we conclude we see a more enlightened path." *See Todd v. Societe Bic, S.A.,* 21 F.3d 1402, 1414 (7th Cir.) (en banc) (Flaum, J. dissenting), *cert. denied,* —— U.S. ——, 115 S.Ct. 359, 130 L.Ed.2d 312 (1994); *see also Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). "Federalism proscribes unwarranted federal judicial meddling in state matters because such interference would 'prevent the informed evolution of state policy by state tribunals.'" *Id.* (quoting *Moore v. Sims,* 442 U.S. 415, 429–30, 99 S.Ct. 2371, 2380–81, 60 L.Ed.2d 994 (1979)). That is, this court is not an appropriate forum for pronouncing an Illinois public policy where the state constitution, statutes or judicial opinions give no clear indication that such policy is "well defined and dominant" in Illinois. *See American Federation of State, County and Municipal Employees, AFL–CIO,* 124 Ill.Dec. at 559, 529 N.E.2d at 540; *Hyatte v. Quinn,* 239 Ill.App.3d 893, 180 Ill.Dec. 427, 430, 607 N.E.2d 321, 324 (1993).

In any event, the policy considerations advanced by the Halls lack merit. The Halls' argument that victims of sexual exploitation by psychotherapists will refrain from reporting the sexual misconduct for fear of triggering the "Sexual Misconduct" provision is based on a false assumption.[4] It assumes that the victims would always be able to conceal the cause of injury—the therapist's

sexual exploitation, and litigate their malpractice suits without making any allegations of sexual misconduct. Although it is conceivable that there may be situations where the sexual misconduct can be distinctively separated from other types of malpractice acts, that is not the situation here and we need not concern ourselves with scenarios not confronting us. *See O'Hara,* 130 Ill.Dec. at 405, 537 N.E.2d at 734 (under Illinois law, "whether or not a contract is contrary to public policy depends on the peculiar facts and circumstances of each case"); *Board of Trustees,* 24 Ill.Dec. 843, 386 N.E.2d 47. *See also Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (holding that the Declaratory Judgment Act only authorizes courts to resolve actual controversies, not to render an advisory opinion given a hypothetical set of facts); *Deveraux v. City of Chicago,* 14 F.3d 328, 330–31 (7th Cir.1994).

■ Despite the Halls' attempt to glean from their underlying complaints allegations that, if standing alone, might be construed as distinct from the alleged sexual misconduct,[5] Sheila Hall and Stone's sexual relationship was so inextricably intertwined with Stone's alleged malpractice as to be inseparable. The central focus of the Halls' underlying complaints was that Stone allegedly manipulated, or failed to control and properly direct, the so-called transference phenomenon[6] for

4. Significantly, Sheila Hall was not deterred from coming forward with her allegations of sexual misconduct. In fact, she properly reported Stone's sexual misconduct to the Illinois Department of Professional Regulation six months before she filed her lawsuit against him.

5. For instance, the Halls point our attention to such broad allegations as that Stone "failed to employ and exercise techniques ... that were generally recognized and approved by the persons engaged in marriage counseling and psychotherapy," and that Stone "gave advice to Plaintiff which was not designed to enforce the marriage and decrease the marital discord."

6. The Illinois courts have explained the transference phenomenon as follows:

The transference phenomenon ... has been defined in psychiatric practice as a phenomenon ... by which the patient transfers feelings towards everyone else to the doctor, who then must react with a proper response, the counter transference, in order to avoid emotional in-

volvement and assist the patient in overcoming problems.... The mishandling of this phenomenon, which generally results in sexual relations or involvement between the psychiatrist or therapist and the patient, has uniformly been considered as malpractice or gross negligence in other jurisdictions....

*Corgan v. Muehling,* 143 Ill.2d 296, 158 Ill.Dec. 489, 494, 574 N.E.2d 602, 607 (1991) (quoting *Horak v. Biris,* 130 Ill.App.3d 140, 85 Ill.Dec. 599, 604, 474 N.E.2d 13, 18 (1985), and internal citations omitted). *See also St. Paul Fire & Marine Ins. Co. v. Downs,* 247 Ill.App.3d 382, 187 Ill.Dec. 130, 136, 617 N.E.2d 338, 344 (1993); *Dausch v. Rykse,* 52 F.3d 1425, 1434 n. 5 (7th Cir.1994) (Ripple J. concurring). Indeed, the several alleged acts of negligence identified by the Halls track the transference phenomenon: Stone allegedly

a) Permitted Sheila Hall to develop an unhealthy dependence on him.... c) Mishandled the transference effect by failing to explore and resolve Ms. Hall's attraction to father figures.

the therapeutic benefit of Sheila Hall and her marriage with Peter Hall, and the sexual relationship between Sheila Hall and Stone was the most significant manifestation of that failure. Sheila and Peter Hall, as well as their children, alleged that their emotional distress or pain and suffering was directly or proximately caused by Stone's sexual contact with Sheila Hall (which began approximately four months after the Halls began seeing Stone for counseling), and that Stone knew or should have known that his engaging in sexual intercourse with Mrs. Hall would make it impossible to resolve the Halls' marital problems. The consistent theory presented by the Halls is that the harm they allegedly suffered flowed from Stone's sexual relationship with Mrs. Hall, which was a result of Stone's manipulation of the transference phenomenon. It is clear that the Halls cannot maintain a viable malpractice suit in the absence of the sexual misconduct allegations; nor could they possibly have concealed allegations of Stone's mishandling of the transference phenomenon.[7]

Indeed, courts that have dealt with therapists' mishandling of the transference phenomenon and the concomitant therapist-patient sexual relationship have recognized that the sexual relationship simply cannot be viewed separately from other aspects of the therapist's malpractice or the therapeutic relationship developed between the therapist and the patient. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Love,* 459 N.W.2d 698, 701–02 (Minn.1990) ("When ... the transference phenomenon pervades the therapeutic alliance, we believe the sexual conduct between therapist and patient arising from the phenomenon may be viewed as the consequence of a failure to provide proper treatment of the transference."); *L.L. v. Medical Protective Co.,* 122 Wis.2d 455, 362 N.W.2d 174, 177–78 (App.1984) ("a sexual relationship between therapist and patient cannot be viewed separately from the therapeutic relationship between them"). *See also Govar v. Chicago Ins. Co.,* 879 F.2d 1581 (8th Cir. 1989) (rejecting claim that sexual acts were only one factor, not an "essential element" in the therapist's malpractice; upholding the application of insurance policy provision that excludes claims arising out of any sexual acts allegedly performed by the insured).

■ Equally unpersuasive is the Halls' argument that the "Sexual Misconduct" provision in the insurance contract discriminates against women[8] and thus also violates the

---

d) Possibly failed to report the transference effect to a colleague who was also treating Ms. Hall. e) Failed to properly evaluate a vulnerable and dependent person.... g) Encouraged Sheila Hall to act out extramarital fantasies. *See* Appellants' Joint Brief at 15–16.

7. The Halls also raise a related argument they call "collateral proximate causation." They argue that the "Sexual Misconduct" provision, which they consider to be an exclusion because of the "grossly inadequate" $25,000 limit, does not necessarily deny them coverage because the harms they suffered were also proximately caused by non-sexually related malpractice acts covered under the policy.

Under the theory extrapolated from the proximate cause principle, an insurer may not assert noncoverage for an injury proximately caused by a cause excluded under the insurance policy when another proximate cause of the injury or damage is within the policy coverage. *See U.S. Fidelity & Guaranty Co. v. State Farm Mut. Auto. Ins. Co.,* 152 Ill.App.3d 46, 105 Ill.Dec. 254, 256, 504 N.E.2d 123, 125 (1987); *see also Insurance Company of North America v. Krigos by Krigos,* 196 Ill.App.3d 200, 143 Ill.Dec. 1, 5, 553 N.E.2d 708, 712 (1990). "Thus, in order for an injury to be excluded from coverage under an insurance policy, the injury must have been caused solely by a proximate cause which is excluded under the policy." *U.S. Fidelity & Guaranty Co.,* 105 Ill.Dec. at 256, 504 N.E.2d at 125 (holding insurer liable under policy issued to daycare center where the daycare center's failure to provide sufficient and adequate supervision proximately caused child's injuries, even though the injuries also arose out of use of an automobile and the policy contained an automobile exclusion). The theory, however, simply has no role in this case because the "Sexual Misconduct" provision does not purport to reduce liability solely for damages caused by the insured's sexual misconduct. Instead, under the unambiguous terms of the provision, the $25,000 limit is triggered whenever the malpractice suit against the insured "involv[es] any actual or alleged erotic physical contact ... by any insured;" the limit applies to "any and all causes of action alleged and arising out of the same or related courses of professional treatment and/or relationships."

8. In support, the Halls rely on a single study published in 1983 which concludes that 92% of the victims of therapist sexual exploitation are women. *See* Bouhoutsos, *Sexual Intimacy Between Psychotherapists and Patients,* 14 Profes-

Illinois public policy of prohibiting gender discrimination. Again, if we were to assume, even for the purpose of argument only, that the provision disproportionately disadvantages women, the Halls have failed to provide support for the proposition that insurers may not limit certain risks because the effect of such limitation disproportionately disadvantages a certain gender. It is true that the Illinois Department of Insurance does prohibit unfair discrimination based on sex. But the discrimination must appear *"in the terms and conditions* of insurance contracts and in the underwriting criteria of insurance carriers." *See* Ill.Admin.Code title 50, ch. 1, § 2603.10, *et seq.* (emphasis added). While the Illinois Department of Insurance has also promulgated regulations to ensure that insurance policies are not applied in a discriminatory manner, the focus is on the gender of the insured, not that of a third party beneficiary of the insurance policy—the regulations require that all insurance underwriting criteria must be applied "without regard to the sex ... of *the insured or prospective insured." Id.* (emphasis added). The Illinois insurance regulations do not expressly prohibit insurance companies from limiting risks that affect disproportionately a particular group of *third party beneficiaries* (who are of the same gender) of the insurance policies. In fact, the Illinois Department of Insurance specifically allows insurers to differentiate in rates on the basis of sex if "such classification or differentiation is based upon [documented] expected claim costs and expenses...." *See* Ill.Admin.Code title 50, ch. 1, § 2603.40. Thus, even if the third party beneficiaries of the insurance policies are within the zone of interest of these regulations, insurers may still differentiate rates on the basis of sex by demonstrating a bona fide statistical difference in risk. Indeed, a number of studies have reported that psychotherapists' sexual involvement with patients is a leading cause of all private psychotherapist malpractice claims and is the most frequent source of litigation against psychologists insured through the American Psychological Association. *See* Jorgenson, Bisbing & Sutherland, *Therapist–Patient Sexual Exploitation and Insurance Liability,* 27 Tort & Ins.

L.J. 595, 596–97 (1992). We are of the opinion that the insurance policy at issue is neutral on its face, is applied without regard to the sex of the insured, and legitimately limits coverage for the undisputed higher risks involved in psychotherapists' practice. We, therefore, do not agree that it is against the public policy of Illinois simply because more women may be affected as the third party beneficiaries of the insurance policy.

### III. Conclusion

We hold that the district court properly granted summary judgment in favor of American Home. The judgment of the district court is AFFIRMED.