98 F.3d 985
 Ann BILHARZ, Plaintiff-Appellant,
v.
FIRST INTERSTATE BANK OF WISCONSIN, a state banking
association, also known as Norwest Bank Wisconsin East
Central; Robert Baldassari and Diane M. Baldassari,
individually; Northern Environmental, a subsidiary of
Bonestroo, Rosene, Anderlik and Associates, Inc.; and Scott
O. Schryver, individually, Defendants-Appellees.
 Nos. 96-1503, 96-1837.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 18, 1996.
Decided Oct. 24, 1996.
 
 Torger G. Omdahl (argued) and Geoffrey C. Lawrence, Iron River, MI, for Plaintiff-Appellant.
 Roger L. Gierhart, David J. Pliner (argued), and Robert J. Kasieta, Bell, Metzner, Gierhart & Moore, Madison, WI, for Robert and Diane M. Baldassari.
 Gregory Bistram, Briggs & Moran, Minneapolis, MN, for Northern Environmental and Scott O. Schryver.
 Before CUMMINGS, BAUER, and EVANS, Circuit Judges.
 TERENCE T. EVANS, Circuit Judge.
 
 
 1
 Eagle's Nest Island is located in a pristine lake on the border between Wisconsin and Michigan. Forty-five of the island's 60 acres are located in Wisconsin and contain a log home and outbuildings. The other 15 acres call Michigan home and remain undeveloped. Given the idyllic setting, the property is worth a pretty penny, somewhere between $400,000 and $580,000. In 1989, the owners of the island, Tedd and Ann Bilharz, defaulted on loans secured by mortgages on Eagle's Nest, and their lender, Norwest Bank, foreclosed. After the foreclosure, Robert and Diane Baldassari purchased Eagle's Nest from Norwest and, 13 months later, evicted the Bilharzes. The Bilharzes weren't exactly eager to leave the nest. Rather, Ann Bilharz sued, alleging, among other things, that the Baldassaris breached an oral promise to hold the island in constructive trust. The district court granted summary judgment for the Baldassaris and imposed sanctions against Bilharz for filing claims without evidentiary support. As we'll explain below, we affirm the grant of summary judgment but reverse the award of sanctions. First, however, we need to set the factual stage for this appeal.
 
 
 2
 In 1987, the Bilharzes acquired Eagle's Nest from Tedd Bilharz' parents' estate. They took the island subject to two mortgages. The mortgages, both on the Wisconsin parcel, were held by Tedd Bilharz' siblings and secured their individual shares of their parents' estate. In September 1987, in exchange for a $150,000 loan from Norwest, the Bilharzes executed a third mortgage on the Wisconsin parcel. Seven months later, Norwest loaned the Bilharzes an additional $40,000, this time using the Michigan parcel as security.
 
 
 3
 Within a year after executing the additional mortgages, the Bilharzes' dream of owning their own island had become a nightmare. They struggled to make the mortgage payments and by May 1989 were in default to Norwest. They also learned that Tedd was stricken with cancer. Eventually, Norwest foreclosed, and Eagle's Nest found itself being hawked on the courthouse steps. Through the foreclosure sales, Norwest wound up buying the Michigan parcel for $47,000 in April 1990 and the Wisconsin parcel for $265,000 in February 1991.
 
 
 4
 After Norwest bought the Wisconsin parcel, Scott Schryver, a bank representative, visited Eagle's Nest and discovered an old underground fuel tank. Schryver's discovery set off bells and whistles at Norwest, so it dispatched Northern Environmental, an environmental engineering firm, to the scene. The ensuing environmental audit turned up some evidence of contamination, which Northern Environmental estimated would run between $10,000 and $100,000 to clean up. Norwest passed this news along to a number of the island's potential purchasers, who, with the exception of the Baldassaris, flew away from Eagle's Nest. Facing the possibility of an expensive cleanup and having already lost its shirt on the Eagle's Nest mortgages, Norwest wanted to cut its losses. In June 1991, after offering the same deal to the Bilharzes, Norwest sold its interest in the Wisconsin foreclosure action and title to the Michigan parcel to the Baldassaris for the bargain sum of $150,000.
 
 
 5
 Before the Baldassaris inked the deal with Norwest, they offered to loan the Bilharzes $400,000 to help them keep Eagle's Nest. Tedd Bilharz, then terminally ill and not certain that the Bilharzes could repay a loan of that size, rejected the offer. According to Ann Bilharz, the Baldassaris then responded with a promise that they never intended to keep. The Baldassaris, Bilharz says, promised that they would reconvey the island to the Bilharzes for $150,000 as soon as the Bilharzes could come up with the cash or locate another buyer. The Baldassaris deny making the promise but agree that we should assume its existence for summary judgment purposes.
 
 
 6
 Shortly after the Baldassaris purchased Norwest's interest in Eagle's Nest, they sent another environmental engineering firm, Square Bay Associates, to the island for a second opinion on the extent of the environmental contamination. In August 1991, Square Bay reported that the contamination was not as extensive as Northern Environmental previously thought. Approximately 11 months later, the Baldassaris evicted the Bilharzes. After the eviction, the Baldassaris cleaned up the contaminated soil--it turned out to be a small-time job requiring only a couple of guys with shovels--for approximately $7,000. A few months later, Tedd Bilharz passed away.
 
 
 7
 In January 1995, after failing to obtain jurisdiction in Michigan, Ann Bilharz filed this diversity case in the United States District Court for the Western District of Wisconsin. She sued Norwest, Schryver, Northern Environmental, and the Baldassaris. She alleged a civil conspiracy under RICO, common law fraud, and breach of an oral promise to hold the property in constructive trust. The district court granted summary judgment for all defendants on all counts. The court also found that Bilharz' claims lacked evidentiary support and awarded the Baldassaris $11,261.51 in attorneys fees and costs under Federal Rule of Civil Procedure 11(b)(3). Bilharz appealed, challenging the grant of summary judgment and the award of sanctions. She has since abandoned her appeals against Norwest, Schryver, and Northern Environmental, leaving only the Baldassaris as respondents. Then, at oral argument, Bilharz agreed to drop her conspiracy and fraud claims against the Baldassaris and proceed only on her constructive trust theory. The Baldassaris think the appeal is frivolous and request additional sanctions under Federal Rule of Appellate Procedure 38.
 
 
 8
 Bilharz first challenges the grant of summary judgment in favor of the Baldassaris on her constructive trust claim. She pins her hopes on a constructive trust, because without one, her claim runs smack dab into the statute of frauds. See Wisconsin Statute §§ 706.01, 706.02 (1993) (requiring that all promises to convey land be in writing). The question is, then, can Bilharz show she is entitled to a constructive trust? The district court said no and granted summary judgment for the Baldassaris. We review that decision de novo, Jasper Cabinet Co. v. United Steelworkers of America, 77 F.3d 1025, 1026 (7th Cir.1996) and, like the district court, apply the law of the forum state, Wisconsin, to this diversity action. American Home Assur. Co. v. Stone, 61 F.3d 1321, 1328-29 (7th Cir.1995).
 
 
 9
 Under Wisconsin law, a constructive trust will be imposed where a party has been unjustly enriched and the enrichment was achieved through wrongful conduct such as fraud, duress, mistake, or an abuse of a confidential relationship. Wilharms v. Wilharms, 93 Wis.2d 671, 678-79, 287 N.W.2d 779, 783 (1980). To show unjust enrichment, Bilharz must prove that she conferred a benefit on the Baldassaris, the Baldassaris knew of the benefit, and it would be inequitable to allow the Baldassaris to retain the benefit. Watts v. Watts, 137 Wis.2d 506, 531, 405 N.W.2d 303, 313 (1987). Bilharz has not shown that she conferred a benefit on the Baldassaris. The Baldassaris paid Norwest $150,000 for Eagle's Nest. They promised to reconvey the island to Bilharz for the same amount. This promise certainly provided a benefit to Bilharz, but what did Bilharz give the Baldassaris in return? The only benefit received by the Baldassaris was the opportunity to purchase a plum piece of property--one with lake views in every direction--for the bargain basement price of $150,000. This benefit, however, was conferred by Norwest, not Bilharz.
 
 
 10
 Bilharz has also failed to show that the Baldassaris obtained Eagle's Nest through wrongful conduct. The wrongful conduct, says Bilharz, was fraud. To prove fraud, Bilharz must show that the Baldassaris made a false representation of fact, with an intent to defraud, and that she relied upon that misrepresentation. Loula v. Snap-On Tools Corp., 175 Wis.2d 50, 54, 498 N.W.2d 866, 868 (Ct.App.1993). Bilharz has not pointed to any evidence suggesting that the Baldassaris intentionally defrauded her in an effort to obtain Eagle's Nest. After all, when Norwest was looking to unload the island in June 1991, the bank's Schryver offered the same $150,000 deal to both the Baldassaris and Bilharz. Bilharz was, in her own words, destitute, and every other potential purchaser--except the Baldassaris--had turned tail at the first hint of environmental contamination. As a result, if the Baldassaris simply wanted to take control of Eagle's Nest, they didn't need to pull a fast one on the Bilharzes to do it. Rather, the Baldassaris needed only to strike the deal with Norwest. Because Bilharz cannot show that she conferred a benefit upon the Baldassaris or that the Baldassaris obtained Eagle's Nest through fraud, Bilharz' claim for a constructive trust fails. As a result, the statute of frauds comes into play, and the district court properly granted summary judgment for the Baldassaris.
 
 
 11
 Bilharz next challenges the district court's decision to award Rule 11 sanctions. The district court found that at the time the complaint was filed, Bilharz' attorney may have reasonably believed the evidence would support Bilharz' allegations. But soon afterward, the court concluded that the attorney should have realized that the claims lacked sufficient evidentiary support. As a result, the court awarded $11,261.51 in attorney fees and costs under Rule 11(b)(3). We review this decision for an abuse of discretion. Johnson v. Waddell & Reed, Inc., 74 F.3d 147, 151 (7th Cir.1996). However, because "Rule 11 sanctions have significant impact beyond the merits of the individual case" and can affect the reputation and creativity of counsel, the abuse of discretion standard does not mean we give complete deference to the district court's decision. Pacific Dunlop Holdings, Inc. v. Barosh, 22 F.3d 113, 118 (7th Cir.1994) (citing Mars Steel Corp. v. Continental Bank N.A., 880 F.2d 928, 936 (7th Cir.1989) (en banc)). Here, although Bilharz' arguments were undoubtedly weak, we cannot say that her claims were so devoid of factual support that sanctions were appropriate. Because we find that Bilharz' conduct in the district court was not sanctionable, we also decline to award sanctions for filing a meritless appeal under Federal Rule of Appellate Procedure 38. Therefore, we AFFIRM the district court's grant of summary judgment in favor of the Baldassaris, but REVERSE its decision to impose sanctions under Rule 11.